Glenn and Bonita SHEPHERD,
Plaintiffs Below,
Appellants,

v.

Rita CLEMENS, a/k/a Rita Shepherd
and Greg Howe, Respondents
Below, Appellees.

No. 67, 1999.

Supreme Court of Delaware.

Submitted: Feb. 15, 2000.
Decided: May 11, 2000.

Matthew P. Denn, of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, for appellants.

Kester I.H. Crosse, of Potter, Carmine & Leonard, Wilmington, Delaware, for appellee, Greg Howe.

Jeanne M. Hanson, Wilmington, Delaware, for appellee, Rita Clemens.

Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT and BERGER, Justices (constituting the Court en Banc).

HOLLAND, Justice, for the majority:

This is an appeal from a final judgment of the Family Court. The petitioners-appellants are Glenn and Bonita Shepherd (the "Shepherds"). The Family Court denied the Shepherds' petition to terminate

the parental rights of Rita Clemens [1] (the "Mother") and Greg Howe (the "Father") with respect to their infant son, Christopher Shepherd. If the petition is granted, the Shepherds plan to adopt Christopher.

This appeal presents an issue of first impression in Delaware with regard to the Father. The Shepherds' petition seeks to terminate the parental rights of an unwed biological father to a child who was conceived during an act that constituted statutory rape. The petition to terminate the Mother's parental rights was uncontested.

The Shepherds have raised two basic arguments in this appeal. First, they contend the Family Court erroneously concluded that the Father had not abandoned Christopher. Second, the Shepherds argue that the Family Court committed legal error when it analyzed Christopher's best interests.

█ We have concluded that the Shepherds presented clear and convincing evidence to establish that Christopher was abandoned by his biological Father and that it is in Christopher's best interest to grant the Shepherds' petition to terminate the rights of both biological parents. Therefore, the judgment of the Family Court must be reversed. This matter is remanded for the entry of an order terminating the parental rights of Christopher's biological parents.

### *Facts*

Christopher Shepherd was born on December 22, 1995. At the time of Christopher's birth, the Mother was 16 years old and the Father was 21 years old. The Mother was 15 years old at the time of conception. Prior to Christopher's birth, the Father, the Mother, and the Shepherds had separate discussions about possible courses of action. They all agreed that the unborn child would be placed for adoption. The Mother and the Shepherds contacted a Pennsylvania adoption agency.

A couple from Pennsylvania was selected to be Christopher's adoptive parents.

Although the Mother and the Father had agreed to place the unborn child for adoption, neither signed the requisite voluntary consent forms prior to Christopher's birth. The record does not reflect why the Father did not sign a consent form prior to Christopher's birth. The Mother testified she began to have misgivings about placing Christopher for adoption, in part, because the Father had not signed his consent form.

Christopher left the hospital to live at the Shepherds' home. The plan to have Christopher adopted by the Pennsylvania couple was never pursued after Christopher's birth. Christopher has lived, since birth, with the Shepherds, who are his maternal grandparents.

Due to the Mother's minority at the time of her sexual relationship with Father, criminal charges were brought against the Father for Unlawful Sexual Intercourse in the Third Degree, a category of statutory rape. He pled guilty on January 10, 1996 in Superior Court to a reduced charge of Unlawful Sexual Contact Third Degree. On the same day, the Father signed a consent form voluntarily relinquishing his parental rights to Christopher.

The Father was sentenced on April 26, 1996. The Father's attorney made the following statement at that time to the Superior Court:

> This was sex between an underage young lady and my client. There is a child that has been born as a result of this, and basically the disability was the young lady's age, Your Honor.
>
> Mr. Howe has entered a plea of guilty to unlawful sexual contact. There is an agreement that he would be placed on probation. This is his very first criminal conviction of any kind. He is employed at Penn Terminal.
>
> And I cannot at this time say that he has made any contact with the child's

1. She has also been known as Rita Shepherd.

mother, because there was a no-contact order, but we understood the child was to be placed for adoption, and that has not been done, and Mr. Howe and his family intend on making contact and supporting the child. Your Honor, I believe I also sent you some letters in that regard that I thought kind of laid out how this was—it was not a predator situation, except for the difference in the ages.

Your Honor, in light of his record, and in light of his accepting responsibility, I would hope that you would stay within the guidelines, as indicated.

The Superior Court sentenced the Father to one year of probation and 100 hours of community service. He was ordered to have no contact with the Mother.

By the time of his sentencing on April 26, 1996, the Father was aware that the Mother had not placed Christopher for adoption as agreed. On April 30, 1996, the Father's attorney sent a letter to the Shepherds' attorney stating that the Father had revoked his voluntary relinquishment of his parental rights because the Mother had not placed the child for adoption. The letter further stated that the Father wished to establish visitation privileges and provide child support without violating the no-contact order issued by the Superior Court. The Father apparently received no response.

On August 23, 1996, the Father's attorney sent a letter directly to the Shepherds asking them to contact him in order to establish visitation. The letter was incorrectly addressed. A copy was forwarded to the Shepherds at their correct address on September 13, 1996. The Shepherds acknowledge that they received the correctly addressed letter and did not respond.

During the summer of 1996, the Mother began having difficulties with the Shepherds, in particular, her own mother. The Mother moved out of the Shepherds' home at their request. Christopher continued to reside with the Shepherds.

The Shepherds decided to adopt Christopher. On September 3, 1996, the Mother signed a form to voluntarily terminate her parental rights. In February 1997, the Shepherds filed the Termination of Parental Rights (TPR) petition, which is the subject of this appeal.

One month later, the Shepherds' filed a Petition for Order of Protection from Abuse (PFA) against the Mother after an incident at their home. On April 4, 1997, a PFA order was entered prohibiting the Mother from having contact with her mother. The Mother's stepfather arranged for the Mother to visit Christopher away from the Shepherds' home.

The Father filed an answer to the TPR petition. In April 1997, the Father and the Mother filed separate petitions for custody of Christopher. The Mother also filed a separate petition for visitation. The Father was subjected to paternity testing. On October 9, 1997, the paternity testing demonstrated that the Father had a 99.94% probability of being Christopher's biological father.

After several interim hearings, the Family Court awarded custody of Christopher to the Shepherds with the concurrence of both the Father and the Mother. The Mother was granted visitation privileges. Visitation was denied to the Father. The Family Court determined that Christopher could suffer psychological harm if he were to begin visitation with the Father, and the Father's parental rights were subsequently terminated.

In December 1998, the Family Court conducted a two-day trial on the Shepherds' TPR petition. On February 19, 1999, the Family Court denied the Shepherds' request to terminate the parental rights of the Mother and the Father. The Shepherds filed this appeal.

### Terminating Parental Rights

■ In Delaware, the statutory standard for terminating parental rights pro-

vides for two separate inquiries.[2] First, there must be proof of an enumerated statutory basis for the termination. Second, there must be a determination that severing the parental right is in the best interest of the child.[3] This Court has consistently held that the best interest element of the statute can be considered only *after* there has been a finding of an enumerated statutory basis for termination.[4]

### Abandonment Established

■ One of the statutory bases for terminating parental rights is abandonment. With respect to a child Christopher's age, the Delaware statutory definition of abandonment is:

> [A] minor who has attained six months of age at the time a petition for termination of parental rights has been filed, and for whom the respondent, for a period of at least six consecutive months immediately preceding the filing of the petition, has failed to:
>
> 1. make reasonable and consistent payments, in accordance with the respondent's financial means, for the support of the minor; and
>
> 2. communicate or visit regularly with the minor; and
>
> 3. manifest the ability and willingness to exercise parental responsibilities, if during the time, the minor was not in the physical custody of the other parent.[5]

Each element of this statutory definition of abandonment must be shown by clear and convincing evidence.[6] The statute further provides that "the respondent's act of abandonment cannot be cured by subsequent conduct. No present intent to abandon the minor need be proved by the petitioner."[7]

The Family Court found that the first criterion for abandonment had been established by clear and convincing evidence: failure to make reasonable and consistent payments in accordance with the Father's financial means. The record reflects that during the six months that preceded the Shepherds' filing of the TPR petition, the Father was living with his grandparents and was employed. The Family Court found that the Father had the financial means to make payments towards Christopher's support. The evidence established, however, that Greg has *never* made *any* payments for Christopher's support.

The Family Court found that the second criterion for abandonment had been established by clear and convincing evidence: the Father's failure to communicate with or visit regularly with Christopher. Greg testified that although he has seen pictures of Christopher, he has never met Christopher. The uncontested evidence at trial also reflected that the Father failed to send Christopher any cards, letters or gifts. The Family Court acknowledged that the Shepherds had not responded to the September 13, 1996 letter from the Father's attorney about establishing visitation. The Family Court also noted that although the Father was represented by the same attorney since before Christopher's birth, the Father did not seek any relief from the Family Court until after the TPR petition was filed and Christopher was already more than one-year old.

■ The Family Court found that the third criterion for abandonment had not been established: failure to manifest the ability and willingness to exercise parental responsibility for a period of at least six months immediately preceding the filing of the termination petition. "Parental responsibilities" are defined in the Delaware

**2.** *In re Kelly Stevens*, Del.Supr., 652 A.2d 18, 24 (1995).

**3.** 13 *Del. C.* § 1103(a)(2).

**4.** *In re Kelly Stevens*, 652 A.2d at 25.

**5.** 13 *Del. C.* § 1101(1).

**6.** *In re Kelly Stevens*, Del.Supr., 652 A.2d 18, 23 (1995).

**7.** 13 *Del. C.* § 1101(1).

statute as "the care, support, and control of the child in a manner that provides for the child's necessary physical needs, including adequate food, clothing and shelter, and that also provides for the mental and emotional health and development of each child."[8] The Family Court's finding is not supported by the record evidence.

The record reflects clear and convincing evidence that the Father has never manifested either the willingness or ability to assume any parental responsibilities. The Father testified that he called his attorney during the summer of 1996 to ask what he needed to do to see Christopher. He was advised to file a visitation petition in the Family Court. The Father testified that he did not file a petition for visitation because he did not want to pay child support. The Father admitted at trial that he could not recall a single thing he had done in the six months before the TPR petition was filed in an effort to visit Christopher. After the Shepherds' TPR petition was filed, the Father testified at the custody hearing on the cross-petition of the Father, the Mother and the Shepherds. The Father agreed that it was in Christopher's best interest for custody to be awarded to the Shepherds.

■ We have concluded that the record reflects that the Father's abandonment of Christopher was established by clear and convincing evidence. Even if the statutory grounds for termination are met, however, a lawful termination of parental rights must also be in the best interests of the child.[9] Accordingly, we proceed to an analysis of Christopher's best interests.

### Termination Best Interests Standard

■ When determining a child's best interests in deciding whether to grant a petition to terminate parental rights, this Court and the Family Court are guided,[10] in part, by the "best interests" factors set forth in Section 722.[11] The "best interests" inquiry is "dependent upon the factual context in which the termination petition is presented."[12] Therefore, the best interests standard requires a careful judicial examination of the circumstances surrounding each termination of parental rights petition.

This Court has stated that one of the important objectives of the termination of parental rights statute is to insure that children are not denied the opportunity for a stable family life.[13] The *Guidelines for Public Policy and State Legislation Gov-*

8. 13 *Del. C.* § 1101(10).

9. *In re Hanks,* Del.Supr., 553 A.2d 1171, 1178 (1989). *See also Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Kelly Stevens,* Del.Supr., 652 A.2d 18, 23 (1995); *Black v. Gray,* Del.Supr., 540 A.2d 431, 433 (1988); *Daber v. Division of Child Protective Services,* Del.Supr., 470 A.2d 723, 726 (1983); *Patricia A.F. v. James R.F.,* Del Supr., 451 A.2d 830, 832–32 (1982) (en banc).

10. *Daber v. Div. of Child Protective Services,* Del.Supr., 470 A.2d 723, 726 (1983).

11. 13 *Del. C.* § 722(a).
 (1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;
 (2) The wishes of the child as to his or her custodian(s) and residential arrangements;
 (3) The interaction and interrelationship of the child with his or her parents, grand-

parents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;
 (4) The child's adjustment to his or her home, school and community;
 (5) The mental and physical health of all individuals involved;
 (6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of [Title 13 of the Delaware Code]; and
 (7) Evidence of domestic violence as provided for in Chapter 7A of [Title 13 of the Delaware Code].

12. *In re Three Minor Children,* Del.Supr., 406 A.2d 14, 19 (1979).

13. *In re Hanks,* Del.Supr., 553 A.2d 1171, 1179 (1989).

*erning Permanence for Children*[14] were promulgated by the U.S. Department of Health and Human Services ("HHS") to facilitate the federal government's Initiative on Adoption and Foster Care. In describing what should be the basic goals of state child welfare agencies, the *Guidelines* state that "the concept of permanency establishes the foundation for a child's healthy development."[15]

Permanency is defined as the safe, stable, custodial environment in which a child is raised, and the life-long relationship that child establishes with a nurturing caregiver.[16] The basic needs of a child—safety and protection, sense of identity, validation of self, stability and continuity, and an opportunity to learn and grow—are most likely to be met in a permanent environment.[17] According to the *Guidelines*, permanence for children can be achieved best by a reunification with the birth parent or with the child's extended family of origin.[18] Permanent placement is intended to last throughout the child's minority. It is designed to establish life-long family relationships for the child and to vest the permanent caregiver with the same legal responsibility for the child as a birth parent.

Christopher is in an environment with his extended family of origin. The Shepherds are Christopher's maternal grandparents. The Shepherds' home is the only one that Christopher has known. The record reflects the Shepherds have provided a stable, loving and nurturing environment in which Christopher has had an opportunity to learn and grow cognitively, physically and emotionally. He is happy and well adjusted. Both the Mother and the Father have repeatedly expressed their desire for Christopher to remain in the custody and care of the Shepherds.

The Mother consents to the termination of her parental rights and also believes that termination of the Father's parental rights is in Christopher's best interest. The Court Appointed Special Advocate ("CASA") also recommends termination of the Father's and the Mother's parental rights. The CASA asserts that the Father has "done absolutely nothing" to exercise his parental rights. The CASA submits that it is in Christopher's best interest to be adopted by the Shepherds.

■ The Family Court denied the Shepherds' petition on the basis that it was in Christopher's best interests to have an opportunity to know his biological Father. That conclusion is not supported by the record. Consequently, it is not the product of an orderly and logical deductive process.[19]

### Statutory Rapist's Parental Rights

The Father was originally charged with statutory rape, which at the time was an offense that the Delaware Code denominated as Unlawful Sexual Intercourse in the Third Degree.[20] That statute stated in relevant part:

A person is guilty of unlawful sexual intercourse in the third degree when the person intentionally engages in sexual intercourse with another person and any of the following circumstances exist:

(1) The intercourse occurs without the victim's consent; or

(2) The victim is less than 16 years of age. Unlawful sexual intercourse in the third degree is a class C felony.

**14.** Donald N. Duquette and Mark Hardin, U.S. Dep't of Health and Human Services, Guidelines for Public Policy and State Legislation Governing Permanence for Children (1999) (herein known as "Guidelines").

**15.** Guidelines, *supra* note 14, at I–3.

**16.** *Id.*

**17.** *Id.*

**18.** *Id.*

**19.** *In re Burns*, Del.Supr., 519 A.2d 638, 643 (1986).

**20.** 11 *Del. C.* § 773 (1995).

The Father pled guilty to and was sentenced for Unlawful Sexual Contact in the Third Degree:

A person is guilty of unlawful sexual contact in the third degree when the person has sexual contact with another person or causes the victim to have sexual contact with the person or a third person and the person knows that the contact is either offensive to the victim or occurs without the victim's consent. Unlawful sexual contact in the third degree is a class A misdemeanor.[21]

In 1993, the Delaware General Assembly enacted Section 728 of Title 13 of the Delaware Code. That section provided:

If a child is conceived and subsequently born as the result of an act of Unlawful Sexual Intercourse, in either the first or second degree with the mother, the biological father of said child shall not be permitted visitation privileges under this section. This subsection shall apply *only* where the father pleads guilty or nolo contendre, or is convicted of Unlawful Sexual Intercourse, in either the first or second degree. (emphasis added).

In 1998, the General Assembly revised certain sex crimes statutes to eliminate the distinction between the varying degrees of rape based on the relationship between the victim and the perpetrator. The offenses of Unlawful Sexual Intercourse in the First, Second, and Third Degree, and Unlawful Sexual Penetration in the First, Second, and Third Degree were replaced with the new offense of Rape. Statutory Rape is now denominated as Fourth Degree Rape.

Those amendments to the Delaware sex crime statutes were accompanied by changes to 13 *Del. C.* § 728(d), which now states:

If a child is conceived and subsequently born as the result of an act of rape of any degree or unlawful sexual intercourse, in either the first or second degree with the mother, the biological father of said child shall not be permitted visitation privileges under this section. This subsection shall apply only where the father pleads guilty or nolo contendre, or is convicted of any degree of rape or unlawful sexual intercourse, in either the first or second degree.

Other states have similar provisions to Section 728(d). New Jersey, Wisconsin, Nevada and Oklahoma are a few of the states that have provisions either terminating the parental rights of the father who conceived a child as a result of a sexual assault, denying custody or visitation to the father, or eliminating the father's right to notice of the impending adoption of the child.[22] Some of the other

---

21. 11 *Del. C.* § 767 (1995).

22. Alaska Stat. § 25.23.180 (1999) (court may terminate parental relationship if child was conceived as a result of sexual assault, and termination is in the best interests of the child); Cal. Welf. & Inst.Code § 361.5 (West 1999) (reunification not provided to parent of child conceived as result of sexual assault); Conn. Gen.Stat. § 45a–717 (1999) (court may terminate parental rights of parent convicted of a sexual assault resulting in the conception of a child, except in certain cases of statutory rape); Idaho Code § 16–2005 (1999) (court may grant termination of parental rights as to a parent who conceived a child as a result of rape; 750 Ill. Comp. Stat. Ann. 50/8 (West 1999) (father's consent to adoption not required if he fathered child as result of criminal sexual abuse or assault); Ind.Code § 31–19–9–8 (1999) (notice to father of adoption proceedings not required if child conceived as result of rape, incest, or sexual misconduct with a minor); Me.Rev.Stat. Ann. Tit. 19–A, § 1658 (West 1999) (court may terminate parental rights of person who conceived child as result of crime involving sexual intercourse, unless court informed that the act was consensual); Mo.Rev.Stat. § 211.447 (1999) (biological father's guilty plea or conviction of forcible rape of the birth mother is conclusive evidence to termination his parental rights); Nev.Rev.Stat. § 125c.210 (1999) (father has no right of custody or visitation if child conceived as result of sexual assault unless consented to by mother and is in the best interest of the child); N.J. Stat. Ann. § 9:2–4.1 (West 1999) (*see infra* text accompanying this note); N.M. Stat. Ann. § 32A–5–19 (Michie 1999); N.Y. Dom. Rel. Law § 111-a (McKinney 1999); Okla. Stat. Ann. Tit. 10, § 7006–1.1 (1999) (stating that the court may terminate

statutes appear to make a distinction between violent rape and statutory rape on the basis that in some cases of statutory rape, the "victim" and the perpetrator are in an on-going relationship, notwithstanding the statutory disability of the mother's age, if it is in the child's best interests. The statutes in those states permit custody or visitation rights to be awarded to an adult who has fathered a child by an underage female, if it is in the child's best interests.

 The Delaware statute does not make a distinction between the rights of a statutory rapist and the rights of a violent rapist.[23] Delaware includes Fourth Degree Rape (statutory rape) in its statute prohibiting an award of visitation rights to a father who has conceived a child as the result of a sex crime. Since the Father did not plead guilty to statutory rape, the statutory prohibition against visitation is not applicable *per se* but it does reflect a significant policy pronouncement by the General Assembly. A statutory rapist may not invoke the legal authority of the Family Court to compel visitation with an illegitimate child who was conceived as a result of his criminal conduct.

Parental rights are fundamental liberties which the law has traditionally recognized and afforded constitutional protections.[24] The United States Supreme Court has stated that "fatherhood depends" on the existence of an actual social relationship with the child and an assumption of parental responsibilities:[25]

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," ... his interests in personal contact with his child acquires substantial protection under the Due Process Cause. At that point, it may be said that he "act[s] as a father for his children." ... But the mere existence of a biological link does not merit equivalent constitutional protection.[26]

The guiding principle that controls the United States Supreme Court's holdings on the termination of an unwed father's parental rights has been succinctly summarized as follows: "It is not the biological fact of parentage alone, however, but the existence of an actual or potential relationship that society recognizes as worthy of respect and protection, that activates the constitutional claim."[27] "This principle rests on a practical recognition that biology and association can together establish a relationship between father and child that may be essential to the happiness of both, even if the formality of marriage is missing."[28]

parental rights if the child was conceived as a result of rape); 23 Pa. Cons.Stat. Ann. § 2511 (West 1999) (father's parental rights may be terminated if child conceived as a result of rape or incest); S.C.Code Ann. § 20–7–1734 (Law Co-op.1999) (father not entitled to notice of adoption proceedings if child conceived as result of criminal sexual misconduct); Wis. Stat. §§ 48.42, 48.415 (1999) (§ 48.42 stating that no notice is required to the father in a termination of parental rights case when the child has been conceived as a result of sexual assault or rape; § 48 .415 stating that parenthood as a result of sexual assault or rape is grounds for involuntary termination of parental rights). The Uniform Putative and Unknown Fathers Act of 1988 also addresses this issue. Unif. Putative and Unknown Fathers Act of 1988 § 5, 9B U.L.A. 91 (West Supp.1999).

**23.** 13 *Del. C.* § 728(d).

**24.** *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). *In re Kelly Stevens*, Del.Supr., 652 A.2d 18, 24 (1995).

**25.** *Lehr v. Robertson*, 463 U.S. 248, 250, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). *In re Kelly Stevens*, Del.Supr., 652 A.2d 18 (1995).

**26.** *Id.*

**27.** *Lehr v. Robertson*, 463 U.S. 248, 259–62, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). *See* Deborah L. Forman, *Unwed Fathers and Adoption: A Theoretical Analysis in Context*, 72 Texas L.Rev. 967 (1994).

**28.** *Pena v. Mattox*, 7th Cir., 84 F.3d 894, 899 (1996); *Cf. Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989).

A biological father who commits a criminal act that meets the elements of statutory rape and has managed somehow to establish a relationship with his child *may* have a constitutionally protected claim to parental rights.[29] He does not, however, have a right to create such a relationship by blocking the adoption of the child.[30] No court has held that the mere fact of biological fatherhood, that was the result of a conception during a criminal act and that is unaccompanied by a relationship with the child, creates an interest that the United States Constitution protects in the name of liberty.[31] In this case, there was and is no relation, other than the biological, between the natural Father and Christopher.

### Conclusion

The Shepherds presented clear and convincing evidence that the termination of the Mother's and the Father's parental rights is in the best interests of Christopher because it will permit him to be adopted by them. The judgment of the Family Court is reversed. This matter is remanded to the Family Court for the entry of a final judgment terminating the parental rights of both biological parents.

BERGER, Justice, dissenting.

The majority's decision is disturbing at many levels. First, it ignores the trial court's findings of fact in favor of its own and, in doing so, goes well beyond our appellate function. Second, the majority fails to appreciate that Christopher can and will have a stable, loving and permanent relationship with the Shepherds even if they do not adopt him. Third, the majority stresses the fact that Father engaged in unlawful sexual relations with Mother and that, under a statute that does not apply, Father would be denied visitation. Since the statute has no bearing on this proceeding, it provides no support for the majority's decision. Finally, the majority imposes a result that may make Christopher's life less complicated over the short term, but is likely to have serious adverse consequences as Christopher gets older. For all of these reasons, I would affirm the decision of the trial court and allow Christopher, Father and Father's family to share in each others' lives.

The standard for appellate review of a trial court's factual findings is highly deferential. The trial court's findings will not be disturbed unless they "clearly are wrong...."[32] Stated another way, the findings must be upheld as long as they are "logical and supported by the record...."[33] There is a good reason for this standard. Appellate courts do not have a complete picture of the evidence. They do not hear the witness's tone of voice, see his reactions, or observe the interaction with other family members in the courtroom. When a witness changes his testimony, as in this case, and tries to explain why he did not mean exactly what he said at a prior hearing, the witness's demeanor can be critical to the fact finder's evaluation of his credibility.

The trial court found that, during the relevant time period, Father failed to make reasonable and consistent payments for Christopher's support and failed to communicate and visit regularly with Christopher. The third element of abandonment, however, is failure to "manifest the ability and willingness to exercise pa-

**29.** *Pena v. Mattox*, 7th Cir., 84 F.3d 894, 901 (1996).

**30.** *Id.*

**31.** *Pena v. Mattox*, 7th Cir., 84 F.3d 894, 900 (1996). *See* Rigel Oliveri, *Statutory Rape Law and the Enforcement in the Wake of Welfare Reform*, 52 Stan. L.Rev. 463 (2000).

**32.** *Division of Family Services v. Harrison*, Del.Supr., 741 A.2d 1016, 1020 (1999).

**33.** *In re Kelly Stevens*, Del.Supr., 669 A.2d 33, 34 (1995).

rental responsibilities." [34] The trial court found that the Shepherds had not satisfied their burden of proving this element by clear and convincing evidence. The trial court noted that Father is employed, has a supportive family and suitable housing. In addition, Father made at least a minimal effort to establish visitation and arrange for support. Finally, the trial court noted the CASA's observation that Father was earnest in his desire to see Christopher and the testimony about Father sobbing in his bedroom because he wanted a chance to know his son. Is this record support for the trial court's finding? Certainly.

The majority never identifies any factual findings of the trial court that were clearly wrong, unsupported, or illogical. It simply makes its own, independent findings without ever seeing or hearing a single witness. It says that Father failed to manifest the ability or willingness to assume parental responsibilities because: (i) he did not pay support; (ii) he did not seek visitation; and (iii) he agreed that the Shepherds should have custody of Christopher. Two of these findings, however, are repetitious. Failure to support and failure to visit are the first two elements of abandonment. The remaining element is failure to manifest ability and willingness to exercise parental responsibilities. The majority defeats the statutory scheme by using the first two elements to establish the third.

The only additional fact relied on by the majority is Father's agreement that the Shepherds should have custody of Christopher. How does that fact demonstrate Father's unwillingness or inability to exercise parental responsibilities? Every time a divorced parent agrees that his former spouse should have custody of the children, does that mean the parent is unwilling or unable to exercise parental responsibilities? Of course not. Father should not be criticized, let alone deprived of all parental rights, because he is thinking of his child's best interest and recognizes that Christo-

pher should grow up in the Shepherd family.

The majority also substitutes its judgment for the trial court's on the question of Christopher's best interest. On this important point, the majority seems to have lost sight of the family's circumstances. Christopher is now, and always will be, living with his relatives. He is not temporarily in the home of foster parents or would-be adoptive parents. Thus, there is no need to terminate parental rights so that a non-relative custodian may adopt a child and establish a family unit. Christopher has all of the permanence, stability and identity of being a legal member of the Shepherd family. All that the majority is doing by terminating Father's parental rights is depriving Christopher of the benefit of growing up knowing his father and his father's family. The majority never even addresses why it would not be in Christopher's best interest to know his father. It simply announces that the trial court's conclusion is not supported by the record.

After making its findings to justify the termination of Father's parental rights, the majority goes to some length analyzing a statutory rapist's parental rights. This is most troubling since the statute under discussion (i) does not apply to Father because it did not exist in this form at the time he had sexual relations with Mother; and (ii) would not have applied to Father even if it had existed in this form because Father did not plead guilty to any degree of rape. Why, then, does the majority dwell on this subject? One cannot help but conclude that the majority was looking for a way to make Father seem less worthy of protection under the law. While I do not condone Father's past relationship with his underage girlfriend, he accepted criminal responsibility for his actions and was punished for his wrongdoing in accordance with law. There is no justification for the majority's imposition of additional

**34.** 13 *Del.C.* § 1101(1)a.3.

punishment on him and his child in the form of termination of parental rights.

Finally, the majority never addresses the implications of its decision. Christopher is being raised by his grandparents, the Shepherds. He now believes that his mother is his sister; his aunt and uncle are his siblings; and his grandparents are his parents. He does not know that he has a whole group of relatives that the Shepherds prevented him from growing up knowing and loving. He also does not know that his missing family is African American. How will this deprivation affect Christopher when he gets older and either is told, or learns the truth on his own? The CASA noted that race is an issue in this case and that it is extremely important for Christopher to know his heritage and be proud of his identity. The CASA suggested that professional help will be needed to deal with the confusion Christopher will experience when he learns the truth. Yet the majority does not even consider this most difficult issue—one that undoubtedly will be part of Christopher's future.

Our State was a leader in the country when it recognized the special needs of families by creating a separate Family Court devoted to domestic relations and children. Every day our Family Court judges balance the conflicting needs of families like the Shepherds and Howes and make decisions to promote the best interests of children like Christopher. Termination of parental rights is a drastic and permanent step that must be undertaken in appropriate cases. This is not such a case. Christopher could continue in the Shepherd's custody, as a full member of their family, without completely depriving Father of his parental rights. The Family Court then could decide on visitation for Father and his family, setting whatever conditions, counseling requirements, or the like, that the Court deems appropriate under the law. This Court simply cannot claim to know better than the trial judge who lived with this case and met the families. There is absolutely no need to terminate Father's parental rights in order to provide comfort, security, or legal status for Christopher. And there will be no way for Christopher to make up for all the childhood activities and family events and celebrations that the majority is forcing him to miss while growing up. It is a shame, and the law did not require this result.