IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VICTORIA CHARLES,[1] | § | No. 162, 2024 |
| | § | |
| Respondent Below, | § | Court Below—Family Court |
| Appellant, | § | of the State of Delaware |
| | § | |
| v. | § | File No. CN22-04113 |
| | § | |
| DEPARTMENT OF SERVICES | § | Petition No. 23-18919 |
| FOR CHILDREN, YOUTH AND | § | |
| THEIR FAMILIES, | § | |
| | § | |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: September 16, 2024
Decided: October 31, 2024

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

### **ORDER**

After consideration of the appellant's brief and the motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26.1(c), the responses, and the Family Court record, it appears to the Court that:

(1) The appellant ("Mother") filed this appeal from the Family Court's order dated March 21, 2024, that terminated Mother's parental rights as to her two children (the "Children"). The Family Court's order also terminated the parental rights of the Children's father ("Father") and denied petitions for guardianship filed

---

[1] The Court previously assigned pseudonyms to the appellant pursuant to Supreme Court Rule 7(d).

by the Children's maternal grandmother, paternal grandmother, and maternal aunt. Father and the guardianship petitioners have not appealed, and we therefore focus on the facts in the record as they relate to Mother's appeal.

(2)     Mother's counsel has filed a brief and a motion to withdraw under Supreme Court Rule 26.1(c).   Mother's counsel asserts that, based upon a conscientious review of the record, there are no arguably appealable issues.  Counsel informed Mother of the provisions of Rule 26.1(c) and provided her with a copy of the motion to withdraw and the accompanying brief.  Counsel also informed Mother of her right to supplement counsel's presentation.  Mother provided points for the Court's consideration.  The Department of Services for Children, Youth and Their Families, Division of Family Services ("DFS") as appellee and the Children's attorney from the Office of the Child Advocate have responded to the Rule 26.1(c) brief and argue that the Family Court's judgment should be affirmed.

(3)     The Children were born in December 2021.  In August 2022, DFS filed a petition for custody, alleging that on August 8, 2022, the Children had arrived at Nemours Children's Hospital after experiencing episodes of being unresponsive and turning blue.  Their blood tested positive for cocaine metabolites.  Mother, Father, and the Children had been living at the maternal grandmother's home, but had moved into a motel a few days earlier, following an altercation between Father and the maternal grandmother's boyfriend.  The Family Court awarded custody of the

2

Children to DFS on an *ex parte* basis. Upon their discharge from the hospital, the Children were placed in a foster home. The mandated hearings ensued.[2]

(4) Following the first adjudicatory hearing, the Family Court found that the Children were neglected as to Mother based on their exposure to cocaine while in her care. Mother had a history of substance abuse, was in a methadone program, and acknowledged that she had relapsed on cocaine at the time of the Children's hospitalization and had taken cocaine in their presence. Mother testified that Mother and Father had moved from maternal grandmother's home to the motel in August after maternal grandmother's boyfriend hit Father with a baseball bat. By the time of the September 2022 hearing, they had resumed living at the maternal grandmother's home.

(5) The Children are medically fragile, with significant respiratory issues. One of the Children ("Luke") has cerebral palsy, global developmental issues, asthma, and substantial cognitive impairment; the other Child ("Michael") has less severe developmental delays. In January 2022, when the Children were one month old, their pediatrician referred them for evaluation by Child Development Watch ("CDW"). Following the evaluation, CDW scheduled an individualized family

---

[2] *See Kline v. Del. Div. Family Servs.*, 2023 WL 2259101, at *1 n.3 (Del. Feb. 28, 2023) ("When a child is removed from home by DFS and placed in foster care, the Family Court is required to hold hearings at regular intervals under procedures and criteria detailed by statute and the court's rules." (citing 13 *Del. C.* § 2514; DEL. FAM. CT. R. CIV. PROC. 212-19)).

3

service plan ("IFSP") meeting for February 7, 2022, to develop a plan for services for the Children. Mother rescheduled and canceled the meeting several times, resulting in delayed initiation of services for the Children until the end of May 2022. Services were supposed to include weekly physical therapy, occupational therapy, and swallowing therapy. Michael did not receive any therapy while he was in Mother's care, and Luke attended only a fraction of the recommended therapy sessions.

(6) After entering foster care, the Children were followed regularly by multiple specialists at Nemours Children's Hospital. Luke had approximately eighty-one medical appointments between August 2022, when they entered foster care, and February 27, 2024, and Michael had fifty-six during that period. While in foster care, both Children also received intensive physical, occupational, and speech therapy weekly; Luke had physical therapy twice per week. They will likely continue to need extensive support as they reach school age; for Luke, the need for treatment and other supports will likely continue into adulthood. Luke also gets sick frequently and requires multiple interventions—including receiving medical-grade suction every four hours—when he is sick in order to avoid hospitalization.

(7) DFS developed a case plan for Mother, and following an October 24, 2022 hearing the Family Court found the case plan to be reasonable. The case plan required Mother to complete a mental health evaluation and comply with

recommended treatment; complete a substance abuse evaluation and comply with recommended treatment; complete a parenting class; obtain employment and work with a family interventionist to develop a household budget; and obtain housing suitable for the Children.

(8)     By January 20, 2023, Mother had completed a mental health evaluation. The evaluating psychologist recommended that Mother receive substance-abuse treatment, complete a twelve-step program, and engage in mental-health therapy. Following her substance-abuse evaluation by "PACE," PACE recommended that Mother participate in the "partialized hospitalization program" and intensive outpatient therapy ("IOP"). Mother's attendance at IOP appointments was inconsistent. Mother was receiving daily methadone treatments. She had tested positive for marijuana and prescribed medications. Mother had obtained a job and was working approximately 29 hours per week. The parents had resumed living with the maternal grandmother.

(9)     Mother checked into a twenty-day inpatient drug-treatment program in February 2023, but she checked herself out six days later. She was also discharged from PACE. In March 2023, Mother tested positive for fentanyl, after which she revoked consent to have her information shared with DFS. She testified that she was given fentanyl at the hospital during treatment following a car accident in which she suffered a broken arm and a dislocated hip and shoulder.

5

(10) By June 2023, Mother and Father were again living in a motel following another physical altercation in the maternal grandmother's home. Mother had completed a parenting class. She had not engaged in mental-health treatment and was not consistently engaging in substance-abuse treatment. She continued to refuse to consent to sharing treatment information with DFS. Mother was not working because of the injuries that she sustained in the car accident.

(11) On July 10, 2023, DFS filed a motion to change the permanency goal from reunification to termination of parental rights ("TPR") and adoption. After a hearing on August 1, 2023, the court found that Mother was receiving mental-health medication through Med Psych and was attending therapy every other week. She was attending IOP appointments but had been discharged from substance-abuse counseling. In addition to positive tests for methadone and EDDP (a methadone metabolite), Mother had tested positive for PCP in April, May, June, and July 2023; marijuana in May and June 2023; and fentanyl in July 2023. The parents had resumed living with the maternal grandmother, but DFS was concerned that a strong smell of smoke in the home would negatively affect the medically fragile Children. The court determined that Mother had not made sufficient progress on her case plan and granted DFS's motion to change the permanency goal.

(12) DFS filed a TPR petition on September 6, 2023. Trial on DFS's TPR petition and the three relatives' petitions for guardianship was held on February 27,

6

2024. The court entered an order denying the petitions for guardianship and terminating Mother's and Father's parental rights on March 21, 2024. By the time of the TPR hearing, Mother was attending therapy every other week, was receiving medication treatment for mental-health conditions, and had completed a parenting class. She also was working at a retail store; submitted paystubs showing that she earned approximately $1000 every other week; and testified that she had recently been promoted to store manager, in which position her gross earnings would be approximately $1900 every other week.

(13) Mother was not attending substance-abuse treatment as recommended by the IOP in which she was enrolled, however. Specifically, she was supposed to attend group therapy three times per week but had not attended any group sessions in the past three months; she was also supposed to attend four individual sessions per month but had attended only two such sessions in the past three months. She had also had positive tests for THC, although she did not have a medical-marijuana card, and Suboxone, a medication that she was not prescribed. Mother and Father continued living with the Children's maternal grandmother, and the condition of the home had improved significantly since DFS had visited in December 2023. But the DFS worker who conducted the home visit shortly before the TPR hearing had ongoing concerns about the home, including that the ceiling of the laundry room appeared ready to collapse; the worker could not observe Mother's and Father's

7

bedroom because the door was locked, even though it was a scheduled visit; and the bedroom door had damage that appeared to be from someone attempting to kick it in. The DFS worker also opined that the home was not safe for the medically fragile Children because of the smoke smell. Moreover, there had been fourteen responses to 911 calls at the home in 2023 and two in the first two months of 2024.

(14) In terminating Mother's parental rights, the court held that DFS had established, by clear and convincing evidence, that Mother had failed to plan adequately for the Children within the statutory time frame.[3] Although the court determined that Mother had satisfied the elements of her case plan relating to mental health, parent education, and employment and budgeting, the court found that she had not completed the elements relating to substance abuse and housing. The court also found that Mother had not demonstrated her ability to provide the heightened level of care that the medically fragile Children required. The court determined that DFS had made reasonable efforts toward reunification and to identify relative placements for the Children. Applying the best-interest factors,[4] the Family Court found that DFS had established, by clear and convincing evidence, that it was in the Children's best interests to terminate Mother's parental rights. Mother has appealed.

---

[3] 13 *Del. C.* § 1103(a)(5).

[4] *See* 13 *Del. C.* § 1103(a) (providing that parental rights may be terminated if one of several statutory grounds is established and termination "appears to be in the child's best interest"); *id.* § 722 (setting forth factors that the court may consider when determining the best interests of a child).

(15) On appeal, this Court is required to consider the facts and the law as well as the inferences and deductions made by the Family Court.[5] We review legal rulings *de novo*.[6] We conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly erroneous.[7] If the Family Court correctly applied the law, then our standard of review is abuse of discretion.[8]

(16) The statutory framework under which the Family Court may terminate parental rights requires two separate inquiries.[9] First, the court must determine whether the evidence presented meets one of the statutory grounds for termination.[10] When the statutory basis for termination is failure to plan adequately for the child's needs, the Family Court must also find proof of at least one additional statutory condition.[11] Second, if the Family Court finds a statutory basis for termination of parental rights, then the court must determine whether terminating parental rights is in the best interests of the child.[12] Both of these requirements must be established by clear and convincing evidence.[13]

---

[5] *Wilson v. Div. of Family Servs.*, 988 A.2d 435, 439-40 (Del. 2010).
[6] *Id.* at 440.
[7] *Id.*
[8] *Id.*
[9] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).
[10] *Id.* at 537. *See* 13 *Del. C.* § 1103(a) (setting forth the grounds for termination of parental rights).
[11] 13 *Del. C.* § 1103(a)(5)a-e (listing additional conditions, including that the child has been in DFS custody for at least one year, or for six months if the child came into care as an infant).
[12] *Shepherd*, 752 A.2d at 537.
[13] *Powell v. Dep't of Servs. for Children, Youth & Their Families*, 963 A.2d 724, 731 (Del. 2008).

(17) Mother contends that the Family Court overlooked the significant progress that she made on her case plan, including as to mental-health and substance-abuse treatment. She also argues that the court erroneously accepted the DFS worker's testimony that the smoke smell in the home was unsafe for the Children, without completing air testing or providing expert testimony that the air was unsafe. She expresses her sincere desire to continue making progress and to take care of the Children.

(18) After careful consideration of the parties' positions and the record on appeal, we conclude that the judgment of the Family Court should be affirmed. Even if the DFS worker's conclusion that the smoke smell in the home created a special risk for the Children was an inadmissible expert opinion, the Family Court's conclusion that Mother did not complete the housing element of her case plan was not clearly erroneous. The conclusion was also based on the instability of the housing situation during the approximately eighteen-month course of the dependency and neglect proceedings and Mother's failure to make the entire home available for inspection during the home visit that Mother requested shortly before the TPR hearing. The record also supports the Family Court's determination that Mother did not complete the substance-abuse element of her case plan because the evidence presented at trial reflected that she had not attended therapy sessions as recommended and had recently had two positive tests for Suboxone, which she was

not prescribed, in addition to regularly testing positive for THC.[14]  Although perfect compliance with recommended treatment should not necessarily be expected, the Family Court determined that Mother's lack of compliance with her treatment program was particularly concerning in light of the heightened level of care and attention that the Children's special needs demanded.  We find no reversible error in the Family Court's decision.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED.  The motion to withdraw is moot.

BY THE COURT:

*/s/Karen L. Valihura*
Justice

---

[14] Although legislation legalizing the personal use of marijuana was adopted in Delaware in 2023, *see 4 Del. C.* § 1301 *et seq.*, implementation of the legislation is still underway, and legal, non-medical sales are not expected to be available until the spring of 2025.  *See generally* Del. Office of the Marijuana Comm'r, Frequently Asked Questions, https://omc.delaware.gov/index.shtml?dc=faq#adultUse.