IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JASON R. HILL,[1] | § | |
| | § | No. 274, 2024 |
| Respondent Below, | § | |
| Appellant, | § | Court Below–Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | File No. 24-01-06TN |
| DEPARTMENT OF SERVICES | § | Petition No. 24-01087 |
| FOR CHILDREN, YOUTH AND | § | |
| THEIR FAMILIES (DSCYF), | § | |
| | § | |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: January 7, 2025
Decided: March 4, 2025

Before **SEITZ**, Chief Justice; **LEGROW** and **GRIFFITHS**, Justices.

## **ORDER**

After consideration of the no-merit brief and motion to withdraw filed by the

appellant's counsel under Supreme Court Rule 26.1(c), the appellee's response, the

Child Attorney's response, and the Family Court record, it appears to the Court that:

---

[1] The Court previously assigned pseudonyms to the appellant under Supreme Court Rule 7(d).

(1) By order dated July 8, 2024, the Family Court terminated the parental rights of the appellant, Jason Hill ("Father"), in his son, born in 2011 (the "Child").[2] Father appeals.

(2) On appeal, Father's counsel has filed an opening brief and a motion to withdraw under Rule 26.1(c). Counsel asserts that she has conducted a conscientious review of the record and the relevant law and has determined that Father's appeal is wholly without merit. Counsel informed Father of the provisions of Rule 26.1(c), provided him with a copy of counsel's motion to withdraw and the accompanying brief, and advised him that he could submit in writing any additional points that he wished for the Court to consider. Father has submitted argument for the Court's consideration. The appellee, the Delaware Department of Services for Children, Youth and Their Families (DSCYF), and the Child's Attorney have responded to counsel's Rule 26.1(c) brief and argue that the Family Court's judgment should be affirmed.

(3) In June 2022, DSCYF was alerted that the Child and his siblings were at risk of possible neglect because their mother was homeless and had untreated mental health diagnoses. A safety plan was put in place under which a non-relative

---

[2] The Family Court's order also terminated the parental rights of the Child's mother, who has also appealed. *See Morris v. Div. of Servs. for Children, Youth and Their Families*, Appeal No. 317, 2024. We refer only to facts in the record that relate to Father's appeal.

would care for the Child and his siblings. Father,[3] who was living in California, participated in a team-decision-making meeting with DSCYF in September 2022, during which he stated that he would come to Delaware and retrieve the Child. He did not, and the Child continued to reside with the non-relative. In January 2023, the non-relative advised DSCYF that caring for the children had become overwhelming and she was no longer willing to care for all three children. On January 5, 2023, the Family Court granted DSCYF's petition for emergency custody of the children.

(4) With the filing of DSCYF's dependency-and-neglect petition, the mandated hearings ensued.[4] On January 11, 2023, the Family Court held a preliminary protective hearing. Father, who was still residing in California, had not seen the Child since the Child's mother took him to Delaware in March 2022. The Family Court noted that Father made contradictory statements: at one point, he stated that he spoke regularly with the Child, but at another point, he stated that he had hardly spoken with the Child. Father was under the impression that the Child and the Child's mother were planning to move to Florida. Father testified that he had offered to come to Delaware to pick up the Child, but he was "given the run around"

---

[3] Father maintained that he was the Child biological father from the outset of the dependency-and-neglect proceedings. Father was formally adjudicated the Child's father by the Family Court on November 14, 2023.

[4] When a child is removed from his home by DSCYF and placed in foster care, the Family Court is required to hold hearings at regular intervals under procedures and criteria detailed by statute and the court's rules. 13 *Del. C.* § 2514; Del. Fam. Ct. Civ. Proc. R. 212-219.

3

by DSCYF about his ability to take the Child back to California.[5] DSCYF was having difficulty determining what services Father might need because he was "extremely combative."[6] When the Child was asked about his desire to return to California to live with Father, he stated that he had no desire to do so and began wetting his bed and exhibiting other signs of distress shortly thereafter. DSCYF had made a referral for counseling, and the Child was otherwise doing well in the non-relative's care. The Family Court found that DSCYF had made reasonable efforts to prevent the removal of the Child from the family home. The Family Court also found that the Child was dependent in Father's care: Father had not cared for the Child for some time, and the Child could not be placed with Father in California without a home assessment under the Interstate Compact for the Placement of Children (ICPC).

(5) On March 8, 2023, the Family Court held an adjudicatory hearing, at which Father did not appear. The Child, who remained in the non-relative's care, was doing well. The Family Court found that the Child remained dependent in Father's care: Father had not visited the Child in Delaware, despite the Child being in foster care since January, and was not actively engaged with DSCYF.

---

[5] App. to DSCYF's Response, at B006.
[6] *Id*. at B007.

(6) On April 3, 2023, the Family Court held a dispositional hearing, at which Father did not appear. DSCYF had developed a plan to facilitate Father's reunification with the Child but had not been able to review it with Father because Father was not in contact with DSCYF. Father's case plan required him to: (i) complete a mental health evaluation with Rachel Brandenburg, Psy.D.—or a comparable provider located in California—and follow all treatment recommendations; (ii) complete a substance abuse evaluation and follow all treatment recommendations; (iii) sign consents to allow DSCYF to communicate with Father's providers; (iv) engage with a family interventionist to obtain and maintain stable housing; (v) complete a parenting class and work with a family interventionist to implement effective parenting skills; (vi) obtain and maintain stable employment; (vii) complete a domestic violence course; and (viii) comply with the conditions of his probation and parole, if any, and not incur new criminal charges.

(7) On June 12, 2023, the Family Court held a review hearing. Father did not attend.[7] The phone number that DSCYF had for him was no longer in service. The Family Court found that Father had not made any progress on his case plan and that the Child remained dependent in Father's care. The Child, who was in therapy,

---

[7] We note that all of the dependency-and-neglect hearings took place on the Zoom video platform.

was doing well and was about to be placed with his younger half-brother's foster family.

(8) On September 8, 2023, the Family Court held a review hearing, which Father attended. Father's DSCYF treatment worker had been able to contact him on August 8 and had forwarded Father a copy of the most recent court order. Father was living in Los Angeles, California. He had been in substance abuse treatment and was now in aftercare. He claimed that the reason that he had been sent to treatment was because his older son lied and told authorities that Father was using illegal substances. Father was renting a room and receiving disability benefits. He claimed that DSCYF had not contacted him until after petitioning for emergency custody of the Child. Father advised the court that he would like to engage with reunification services. The Child continued to do well in the foster home with his younger brother, and the foster family facilitated visits between the Child and his older brother and other biological relatives. At the conclusion of the hearing, the Family Court appointed counsel to represent Father going forward.

(9) On December 13, 2023, the Family Court held another review hearing. Father had provided DSCYF with proof of his participation in a Self Help and Recovery Exchange program and a character reference letter. Father was working toward obtaining a ministry license and a bachelor's degree. Father had provided DSCYF with proof of his temporary disability income. Father's treatment records

6

from May 2023 to August 2023 reflected clean urine screens. Father was meeting weekly with his counselor, had enrolled in a parenting class, and had weekly virtual visits with the Child. Father had also participated in a DSCYF team meeting on November 29 by video. Father was aware that the Child wanted to continue living with his foster parents and expressed a desire to meet them. Father averred that he was engaged with mental health treatment, would complete a parenting class in January, and was receiving temporary disability income while he was in treatment. Father explained that he believed it to be in the Child's best interest to be placed with him because he is the Child's biological father. The Child was doing well in school and enjoying extracurricular activities, but he no longer wanted to visit with Father on a weekly basis.

(10) On January 16, 2024, DSCYF filed a motion to change the permanency plan from reunification to termination of parental rights (TPR) for the purpose of adoption. Shortly thereafter, DSCYF filed a TPR petition on the grounds that Father had failed to plan adequately for the Child's physical needs or mental and emotional health and development. On January 25, 2024, a little over one year after the Child came into DSCYF's custody, the Family Court held a permanency hearing. DSCYF had received a progress letter detailing Father's substance abuse treatment—he was on track to complete treatment in six months. Father claimed that he had completed a parenting course, but DSCYF still needed proof that he had completed it as well

7

as proof that he had completed a domestic violence course. Father was living in a sober living home. Father had participated in a "meet and greet" meeting with the Child's foster parents, during which the Child told Father directly that he did not want to return to California and live with him. Despite the Child relaying his wishes to Father, Father advised the Child and DSCYF that he intended to pursue reunification. The Child was flourishing in foster care and continued to enjoy visits with his older brother and other relatives. At the conclusion of the hearing, the Family Court granted DSCYF's motion to change the permanency goal and scheduled a TPR hearing for April 29, 2024.

(11)   On March 18, 2024, the Family Court conducted a child interview of the Child, then twelve years old. The Child told the court that he wanted his foster parents to be his parents and that his biological parents are "bad examples."[8] The Child did not wish to have any further contact with Father. He told the court that when he lived with Father, they were often homeless. He also told the court that Father used drugs in front of him and had asked him to revive Father by "putting something in his nose if he overdosed."[9] When the Family Court asked the Child how he would feel living with Father if Father had stable housing and was no longer abusing drugs, the Child advised that he would still have "no desire" to do so.[10]

---

[8] App. to DSCYF's Response, at B053.
[9] *Id.*
[10] *Id.*

8

(12) The Family Court held a TPR hearing on April 29, 2024 and June 27, 2024. At the hearing, the Family Court heard testimony from Father, the Child's mother, Father's treatment worker, the Child's permanency worker, and the Child's foster mother. The evidence established that Father had received mental health and substance abuse treatment at the Tarzana Treatment Center and had completed parenting classes and domestic violence classes. Despite Father's testimony at the September 2023 review hearing that he was sent to treatment because his older son lied about his drug use, Father acknowledged that he had been abusing drugs after the dependency-and-neglect proceedings began. Father was living in a friend's two-bedroom house but would be able to rent a four-bedroom house from his pastor when the Child was returned to his care. Father also claimed that he made $2,500 monthly from disability benefits and $450 weekly as a CEO of a non-profit organization.

(13) Father's treatment worker testified that Father had participated in a meeting with DSCYF following the January permanency hearing on February 1, 2024, to discuss the steps that he needed to take to complete his case plan. Specifically, Father was aware that he needed ICPC approval of a residence before the Child could be placed with him and that DSCYF needed proof of Father's income and employment. Despite this knowledge, Father had not asked DSCYF for an ICPC assessment of any residence in California, nor had Father provided DSCYF of proof of his income or employment. At the February 1 meeting, Father and DSCYF had

9

also discussed Father returning to Delaware to undergo a mental health evaluation by Dr. Brandenburg. Father had not done so. Nor had Father undergone a mental health evaluation by a comparable provider in California. Importantly, Father had not travelled to Delaware to visit with the Child since the Child's mother took him to Delaware more than two years earlier, in March 2022. Because Father was not in Delaware, the Child's therapist was not able to provide family reunification therapy to Father and the Child. Father insisted that the Child's representations to the court made during the child interview were false: he had never used drugs in front of the Child and the Child was always well-cared for in his and the Child's mother's care. Finally, the evidence established that Child was thriving in the care of his foster family, which was an adoptive resource: the Child had blossomed from an introverted and struggling student into an outgoing honor roll student. Following the hearing, the Family Court issued a written decision terminating Father's parental rights in the Child on the basis of his failure to plan. This appeal followed.

(14) On appeal, this Court is required to consider the facts and the law as well as the inferences and deductions made by the Family Court.[11] We review legal rulings *de novo*.[12] We conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly

---

[11] *Wilson v. Div. of Family Servs.*, 988 A.2d 435, 439-40 (Del. 2010).
[12] *Id.* at 440.

erroneous.[13] If the trial judge has correctly applied the law, then our standard of review is abuse of discretion.[14] On issues of witness credibility, we will not substitute our judgment for that of the trier of fact.[15]

(15)    The statutory framework under which the Family Court may terminate parental rights requires two separate inquiries.[16] First, the court must determine whether the evidence presented meets one of the statutory grounds for termination.[17] When the statutory basis for termination is failure to plan, the Family Court must also find proof of at least one additional statutory condition.[18] If the Family Court finds a statutory basis for termination of parental rights, the court must then determine whether, under 13 *Del. C.* § 722, severing parental rights is in the child's best interest.[19] Both of these requirements must be established by clear and convincing evidence.[20]

(16)    Here, the Family Court found that DSCYF had proved, by clear and convincing evidence, that the termination of Father's parental rights was appropriate based on his failure to plan adequately for the Child's physical needs or mental and

---

[13] *Id.*

[14] *Id.*

[15] *Wife (J.F.V.) v. Husband (O.W.V., Jr.)*, 402 A.2d 1202, 1204 (Del. 1979).

[16] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).

[17] *Id.* at 537.

[18] 13 *Del. C.* § 1103(a)(5)(a)-(e) (listing additional conditions).

[19] *Shepherd*, 752 A.2d at 536-37.

[20] *Powell v. Dep't of Servs. for Children, Youth and Their Families*, 963 A.2d 724, 731 (Del. 2008).

emotional health and development[21] and that the Child had been in DSCYF custody for more than one year.[22] The Family Court then examined the best-interests factors set out in 13 *Del. C.* § 722 and—giving significant weight to factor 5 (the mental and physical health of the individuals involved)—found, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interest.[23]

(17) In the points that Father has submitted for the Court's consideration, he blames poor communication with DSCYF, scheduling conflicts, and difficulties securing documentation for his failure to complete his case plan. Father's complaints are conclusory—Father does not identify any specific facts to support these arguments or how his arguments warrant reversal. And, despite Father's claims, the Family Court consistently found that DSCYF had made reasonable efforts to prevent the removal of the Child from his family home and made reasonable efforts to reunify the family. Indeed, DSCYF continued to work with Father after the Family Court changed the permanency plan from reunification to TPR for the purpose of adoption. In short, Father's points do not warrant reversal.

---

[21] 13 *Del. C.* § 1103(a)(5).

[22] *Id.* § 1103(a)(5)(a).

[23] In connection with factor 1 (the parties' wishes), the Family Court noted that this factor weighed against termination of Father's paternal rights. However, it expressed concern that Father testified that he was confident that the Child's mother could care for the Child, despite Father's knowledge that the Child's mother had not completed any elements of her case plan.

(18) Having carefully reviewed the parties' positions and the record on appeal, we find that the Family Court's factual findings are supported by the record, and we can discern no error in the court's application of the law to the facts. We therefore conclude that Father's appeal is wholly without merit and devoid of any arguably appealable issues. We are satisfied that Father's counsel made a conscientious effort to examine the record and the law and properly determined that Father could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED. Counsel's motion to withdraw is moot.

BY THE COURT:

*/s/ N. Christopher Griffiths*
Justice

13