IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VIVIAN A. THOMPSON,[1] | § | |
| | § | |
| Respondent Below, | § | No. 410, 2014 |
| Appellant, | § | |
| | § | Court Below—Family Court |
| v. | § | of the State of Delaware, |
| | § | in and for Kent County |
| DIVISION OF FAMILY SERVICES, | § | File No. 12-10-1TK |
| | § | Petition No. 12-32909 |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: October 30, 2014
Decided: November 18, 2014

Before **STRINE**, Chief Justice, **RIDGELY**, and **VALIHURA**, Justices

**O R D E R**

This 18th day of November 2014, upon consideration of the appellant's brief filed under Supreme Court Rule 26.1(c), her attorney's motion to withdraw, and the response and motion to affirm filed by the Division of Family Services ("DFS"), it appears to the Court that:

(1) The Family Court terminated the parental rights of the appellant, Vivian A. Thompson ("Mother"), with respect to her four-year-

---

[1] The Court previously assigned pseudonyms to the parties under Supreme Court Rule 7(d).

old son, Chad,[2] in an order dated July 9, 2014.[3] This is Mother's appeal from the termination of her parental rights.

(2) Mother's appointed counsel has filed an opening brief and a motion to withdraw under Supreme Court Rule 26.1(c). Counsel asserts that she has reviewed the record and has determined that no arguable claim for appeal exists. By letter, Mother's counsel informed Mother of the provisions of Rule 26.1(c) and provided her with a copy of the motion to withdraw and accompanying brief. Although notified of her right to submit points for this Court's consideration, Mother has not submitted any points. DFS has filed a response to counsel's Rule 26.1 brief and has moved to affirm the Family Court's judgment.

(3) The record reflects that Chad was born in March 2010. In July 2010, DFS opened a treatment case for Mother because Mother was unable to meet the medical needs of Chad and Chad was too young to protect himself and make his needs known. Throughout 2010 and 2011, DFS had concerns regarding where Mother resided, her mental health, and Chad's delayed development. In 2012, DFS became concerned that Chad was not

---

[2] "Chad" is a pseudonym hereby assigned to Mother's son.

[3] The Family Court's order also terminated the parental rights of the Child's father ("Father"). That portion of the Family Court's order is the subject of a separate appeal. *Thompson v. Div. of Family Servs.*, No. 425, 2014 (Del.).

safe in Mother's presence and that Mother's mental health issues remained untreated.

(4) On March 29, 2012, the Family Court granted DFS's emergency petition for custody of Chad. The Family Court concluded that there were sufficient emergency conditions indicating that Chad was dependent, neglected, and/or abused and should not remain in Mother's care because Mother had serious mental health problems and could not provide the necessary care and protection for Chad.

(5) A preliminary protective hearing was held on April 4, 2012. Counsel was appointed to represent Mother, who contested DFS's actions. After hearing testimony, the Family Court held that Chad continued to be dependent or neglected, there was probable cause for DFS to have temporary custody, and that DFS had made reasonable efforts to prevent placement of Chad outside the home of his natural parents.

(6) An adjudicatory hearing was held on May 16, 2012. The Family Court was advised that Mother agreed to Chad remaining in the custody of DFS and had signed a case plan before the hearing. The elements of the case plan included, among other things, Mother maintaining safe and stable housing, developing a household budget, working with a parent aide to obtain a better understanding of child development, undergoing a

3

psychological examination, following any treatment recommendations, and signing consent forms so DFS could communicate with her mental health providers. The Family Court concluded that DFS made reasonable efforts to prevent placement of Chad outside the home of his natural parents and it was in the best interests of Chad to remain in DFS's custody.

(7) A review hearing for Mother and a dispositional hearing for Father was held on June 19, 2012. DFS expressed concerns regarding Mother's behavior during visits with Chad and noted that Mother had recently undergone a mental health evaluation. The Family Court concluded that DFS was making reasonable efforts to reunify Chad with his family and it was in the best interests of Chad to remain in DFS's custody.

(8) A review hearing for Mother and an adjudicatory hearing for Father was held on July 18, 2012. Mother's mental health had been evaluated by Dr. Joseph Zingaro. According to Dr. Zingaro, Mother suffered a variety of mental health issues, including post-traumatic stress disorder ("PTSD") and borderline personality disorder. Dr. Zingaro believed that a child placed with Mother would be at physical and emotional risk. Mother was not seeing her therapist, was overwhelmed by caring for more than one child, and did not have stable housing. The Family Court concluded that DFS was making reasonable efforts to reunify Chad with his

4

family, it was in the best interests of Chad to remain in DFS's custody, and DFS had made reasonable efforts to seek permanency.

(9) DFS filed a Motion to Change Goal to termination of parental rights ("TPR"). A permanency hearing was held on September 6, 2012. Mother testified that she would consent to TPR if Chad was placed with her aunt and Father's parental rights were terminated, she had little family support, she needed more counseling before she could care adequately for Chad, and that she would make a better aunt than mother. Mother had successfully completed a parenting course, but had not received mental health counseling since July. DFS stated that Mother could continue to work on her case plan elements even if the goal was changed to TPR.

(10) In a decision dated September 19, 2012, the Family Court granted the Motion to Change Goal. The Family Court found that Mother had failed to complete significant elements of her case plan, was unlikely to acquire the necessary parenting skills in the near future, and due to the personal trauma she suffered at the hands of Father (who was also her father), was unlikely to be in a position to provide for Chad's emotional and physical well-being in the foreseeable future. On October 2, 2012, DFS filed a petition for TPR.

(11)  A TPR hearing was originally scheduled for April 25, 2013.  At the hearing, the Family Court granted Father's request for new counsel and ordered that the hearing be rescheduled.  The TPR hearing was rescheduled for September 3, 2013, but was rescheduled again after Father's counsel requested a continuance due to a death in his family.

(12)  A TPR hearing was held on February 24, 2014.  The Family Court heard testimony from Dr. Zingaro, a police officer who responded to a domestic dispute between Mother and her boyfriend, two women Mother resided with before DFS obtained custody of Chad, a DFS treatment worker, a parent aide case manager, two DFS permanency workers, Mother, Mother's aunt, Father, Chad's foster father, and the Court Appointed Special Advocate ("CASA").  The testimony established that Mother had failed to complete significant portions of her case plan.

(13)  Mother had not obtained stable housing and was residing with a relative she had previously accused of engaging in inappropriate conduct.  Before DFS removed Chad from Mother's care, witnesses testified that Mother would leave Chad in his high chair for extended periods and neglect to feed him or change his diapers.  Although Mother completed a parenting class, witnesses observed Mother occasionally become unreasonably upset when Chad behaved in a way that was normal for a child of his age and

6

development. Mother's visitation with Chad was inconsistent in 2012, but became more consistent over time. Mother attended only some of Chad's medical appointments and testified that she had to attend a number of her own medical appointments because she had ovarian cancer.

(14) Mother had serious mental health issues, but failed to obtain consistent treatment for those issues. She frequently changed treatment providers and sometimes refused to sign medical releases, preventing DFS from verifying that she was obtaining consistent treatment. Dr. Zingaro testified that he believed Mother had difficulty taking care of herself, let alone a child. The CASA also testified that she did not believe Mother could care adequately care for Chad, who was developmentally delayed and had special needs.

(15) In an order dated July 9, 2014, the Family Court found, based on clear and convincing evidence, that Mother had failed to plan adequately for the Child,[4] and that termination of Mother's parental rights was in the Child's best interest.[5] The Family Court also found that the Child had been in the custody of DFS for more than one year,[6] there was a history of

---

[4] 13 *Del. C.* § 1103(a)(5)(a).

[5] *Id.* § 1103(a).

[6] *Id.* § 1103(a)(5)(a)(1).

7

neglect by Mother,[7] and Mother was unable to assume promptly the care and custody of Chad.[8] In the same decision, the Family Court also terminated Father's parental rights.

(16) On appellate review of a termination of parental rights, this Court is required to consider the facts and the law as well as the inferences and deductions made by the Family Court.[9] We review legal rulings *de novo*.[10] We conduct a limited review of the factual findings of the Family Court to assure that they are sufficiently supported by the record and are not clearly wrong.[11] If the trial judge has correctly applied the law, our review is limited to abuse of discretion.[12]

(17) In reviewing a petition for termination of parental rights, the Family Court must employ a two-step analysis.[13] First, the Family Court must determine whether the evidence presented meets one of the statutory

---

[7] *Id.* § 1103(a)(5)(a)(2).

[8] *Id.* § 1103(a)(5)(a)(4).

[9] *Wilson v. Div. of Fam. Services*, 988 A.2d 435, 439-40 (Del. 2010).

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).

grounds for termination.[14] Second, the Family Court must determine whether termination of parental rights is in the best interest of the child.[15] Both of these requirements must be established by clear and convincing evidence.[16]

(18) We have carefully reviewed the parties' submissions and the record below, including the transcript of the TPR hearing. We conclude that there is ample record evidence supporting the Family Court's termination of Mother's parental rights based on failure to plan and that termination was clearly in the Child's best interest. We find no abuse of discretion in the Family Court's factual findings and no error in its application of the law to the facts. Accordingly, we affirm the judgment below.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED. The motion to withdraw is moot.

BY THE COURT:

/s/ Karen L. Valihura
Justice

---

[14] *Id.* at 537. *See also* 13 *Del. C.* § 1103(a)(1-8) (listing grounds for termination of parental rights).

[15] 13 *Del. C.* § 722(a)(1-8) (listing factors to be considered when determining best interest of child).

[16] *Powell v. Dept of Servs. For Children, Youth & Their Families*, 963 A.2d 724, 731 (Del. 2008).