IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KAITLYN BEAMER,[1] | § | |
| | § | No. 630, 2018 |
| Respondent Below, | § | |
| Appellant, | § | Court Below—Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | File No. CS18-03-03TS |
| DIVISION OF FAMILY SERVICES, | § | |
| | § | Petition No. 18-06448 |
| Petitioner Below, | § | |
| Appellee. | § | |
| | § | |

Submitted: May 9, 2019
Decided: July 10, 2019

Before **STRINE**, Chief Justice; **SEITZ** and **TRAYNOR**, Justices.

## ORDER

Upon consideration of the appellant's brief filed under Supreme Court Rule 26.1, her attorney's motion to withdraw, the response of the Division of Family Services ("DFS"), and the response of the attorney *ad litem*, it appears to the Court that:

(1)     The respondent below-appellant, Kaitlyn Beamer ("the Mother"), filed an appeal from the Family Court's decision, dated December 7, 2018, terminating

---

[1] The Court previously assigned a pseudonym to the appellant under Supreme Court Rule 7(d).

her parental rights over her son ("the Child").[2]  On appeal, the Mother's counsel ("Counsel") has filed an opening brief and motion to withdraw under Supreme Court Rule 26.1.  Counsel represents that she has made a conscientious review of the record and the law and found no meritorious argument in support of the appeal.  The Mother has not submitted any points for the Court's consideration.  In response to Counsel's submission, DFS and the Child's attorney *ad litem* have moved to affirm the Family Court's termination of the Mother's parental rights.  After careful consideration, this Court concludes that the Family Court's judgment should be affirmed.

(2)  The Child was born in May 2015.  On July 21, 2016, DFS was awarded temporary custody of the Child by emergency *ex parte* order.  DFS alleged that the Mother, who had recently come to Delaware from Florida, was currently homeless and was suspected to have active substance-abuse issues as well as untreated mental-health issues.  There were also concerns that the Mother would flee to Florida with the Child.

(3)  At the preliminary protective hearing on July 25, 2016, the Family Court appointed counsel to represent the Mother.  The Mother contested whether there was probable cause to believe the Child was dependent, neglected or abused, or that there was a substantial imminent risk thereof, in her care.  A DFS employee

---

[2] The Family Court also terminated the parental rights of the Child's father, who is not a party to this appeal.  We only recite the facts in the record as they relate to the Mother's appeal.

testified that they received a hotline report in June that the Child was abused and neglected by the Mother. The employee made contact with the Child's maternal grandmother who was living in a debris-crowded residence inappropriate for a child. The maternal grandmother reported that she had fought recently with the Mother, the Mother was using synthetic heroin, that the Mother had mental-health problems and was seeking to avoid DFS, and that the Mother was not caring for the Child well. The maternal grandmother had recently dropped the Mother and Child off near the Maryland state line.

(4) DFS made contact with the Mother after receiving a report that she was acting erratically near a restaurant in Seaford. The Mother, the maternal grandmother, and the maternal great-grandmother had gotten into a fight at the restaurant. A DFS employee spoke to all three women at the police station. At that time, the Mother's pupils appeared to be pinpoint, which can be indicative of someone using opiates, and she was shaking and sweating. With the Mother's consent, DFS developed a safety plan for the Child to live with the maternal great-grandmother and for the Mother to have supervised visits. The maternal great-grandmother was only available as a temporary placement for the Child because of her age and health issues. In light of this and the Mother's refusal to comply with the safety plan as discussed below, DFS obtained emergency *ex parte* custody of the Child and placed him with a foster family.

3

(5)    DFS learned that the Florida Child Protective Services had received a medical neglect report for the Child shortly after he was born at home with severe jaundice. The Florida medical neglect case was closed as unsubstantiated. At the Mother's first supervised visit with the Child, she appeared ill and behaved erratically. She threatened to return to Florida and revoked her consent to the child safety plan. She also refused to undergo substance-abuse and mental-health evaluations, despite her previous agreement to do so as part of the safety plan. The Mother testified that she had no substance-abuse problems, but took Lexapro for her anxiety. As a pagan, the Mother opposed vaccines and immunizations. The Mother hoped to move somewhere in Florida where her friends could support her.

(6)    The Family Court found there was probable cause to believe that the Child was dependent, neglected or abused, or that there was a substantial risk thereof. Probable cause factors included unstable housing, allegations of substance-abuse and untreated mental-health issues, medical concerns for the Child, and the Mother's risk of flight. The Family Court also found that it was in the best interests of the Child to be in DFS's custody, that DFS had made reasonable efforts to prevent the unnecessary removal of the Child from his home, and that DFS exercised due diligence to identify adult relatives of the Child.

(7) On August 22, 2016, the Family Court held an adjudicatory hearing for the Mother as the suspected father had not yet undergone genetic testing. The Mother stipulated to a finding of dependency based on her mental-health issues, but understood that additional elements would be included in the reunification case plan. She waived her right to an adjudicatory hearing.

(8) The psychologist who evaluated the Mother's mental health testified that the Mother met the criteria for generalized anxiety disorder and adjustment disorder with depression. He was puzzled by some of the Mother's statements and believed that six months of counseling might allow a therapist to determine if the Mother had additional mental-health issues. He also testified that the Mother was unable to explain why her pagan beliefs included opposition to vaccines and immunizations. The Mother told a DFS worker that she would become a Jehovah's Witness so the Child would not receive shots.

(9) Based on the Mother's stipulation, the Family Court found that the Child was dependent and should remain in DFS's custody. The Family Court also found that DFS had made reasonable efforts to prevent the unnecessary removal of the Child from his home and to identify adult relatives of the Child. The Family Court granted DFS's motion (supported by the Child's attorney *ad litem* and opposed by the Mother) to schedule the Child for vaccinations.

5

(10)  On September 26, 2016, the Family Court held a dispositional hearing. The Mother's case plan for reunification was accepted into evidence without objection.  The case plan elements included the Mother's consistent visitation with the Child, compliance with the psychologist's recommendations for mental-health counseling for at least six months, completion of a substance-abuse evaluation and compliance with any recommendations for treatment, completion of a parenting class, employment, and safe housing.  The DFS treatment worker testified that the Mother had recently tested positive for barbiturates.  The Mother had missed her last two visits with the Child, but otherwise the visits were going well.  The Family Court granted the request of the Child's attorney *ad litem* for increased visitation (twice a week instead of once a week) with the Mother.  The Family Court found that the Child was dependent and should remain in DFS's custody.  The Family Court also found that DFS was making reasonable efforts to reunify the Child with the Mother.

(11)  On November 21, 2016, the Family Court held a review hearing.  The Mother arrived for the hearing, left after telling her attorney that she did not want to be there, and then joined the hearing late.  The DFS treatment worker testified that the genetic testing confirmed the identity of the father, who lived in Washington. DFS was starting the application process under the Interstate Compact for the Placement of Children ("ICPC").  Since the last hearing, the Mother had cancelled, missed, or failed to confirm most of the scheduled visits with the Child.  She also

6

left two visits early, one after twenty minutes because she was having an anxiety attack and feared rejection. The Mother was not receiving mental-health or substance-abuse treatment. She had also failed to start a parenting class. The Mother worked with her mother cleaning houses, but had not provided any proof of income. The Family Court found that the Mother had made minimal progress on her case plan, that the Child continued to be dependent, and that DFS had made reasonable efforts toward reunification.

(12) On February 13, 2017, the Family Court held a second review hearing. The Mother had only visited the Child twice since the last hearing. The Mother testified that she had left messages about visits, but her calls were not returned. The foster care worker testified that visits were always on Tuesdays and Thursdays as long as the Mother confirmed the day of the visit or the day before that she would attend the visit, and the Mother was not doing that. The worker also testified that she would return any messages the Mother left for her.

(13) The Mother had met a psychiatric nurse practitioner, who diagnosed the Mother with anxiety and adjustment disorder and prescribed Lexapro, which the Mother declined to take. The Mother testified that she did not refuse to take Lexapro, which she did not feel she needed, and was open to taking it. The Mother continued to deny any problems with substance abuse, but had seen a substance-abuse counselor twice and had a negative urine screen. She had not yet completed

parenting classes. The Mother continued to earn money cleaning houses but, as before, had not provided any proof of income. The Child, who had moved to a new foster home, had accidentally burned himself on a stove, but was otherwise doing well. The Family Court found that the Mother had made some progress on her case plan, but expressed concern that she only visited the Child twice in a three-month period. The Family Court found that the Child was dependent and should remain in DFS's custody. The Family Court also found that DFS was making reasonable efforts toward permanency for the Child.

(14) On May 8, 2017, the Family Court held a third review hearing. The Mother failed to appear for the hearing. The ICPC application was denied because the father had moved and not provided a new address. He provided his new address to the Washington ICPC worker. The foster care worker testified that the Mother had attended thirteen out of twenty-two scheduled visits, with seven of the missed visits attributable to the Mother and two of the missed visits attributable to the foster care agency. Visits generally went well, but the Mother had to be told twice not to let the Child eat packets of artificial sugar. The Mother had completed parenting classes. The Mother was receiving substance-abuse counseling through Brandywine Counseling and could also receive mental-health counseling there. She had two positive urine screens for barbiturates. She continued to clean houses with her mother, but had not provided any proof of income. The treatment worker testified

8

that the Mother often did not respond to her calls or letters. The Child was doing well in foster care.

(15) The Family Court found that the Mother had made some progress, albeit late, on her case plan. The Family Court found that the Child was dependent and should remain in DFS's custody. The Family Court also found that DFS was making reasonable efforts toward permanency for the Child.

(16) On August 7, 2017, DFS filed a motion to change the plan from reunification to termination of parental rights for purposes of adoption. The Family Court ruled that the motion would be considered at the next hearing. At the August 21, 2017 permanency hearing, DFS and the Mother stipulated that the Mother had made more progress on her case plan and should have more time to complete her case plan with the goal of reunification remaining in effect. The ICPC process for the Father was ongoing.

(17) The Mother had attended eleven of twenty-eight offered visits with the Child, with thirteen of the missed visits attributable to the Mother and four of the missed visits attributable to the foster care agency or for another reason. The Mother testified that she often forgot to confirm visits in advance as she was required to do. The DFS treatment worker testified that if the Mother improved her visitation attendance, DFS would consider unsupervised visits as well as longer visits and possible overnight visits. The Mother was receiving mental-health and substance-

9

abuse counseling through Brandywine Counseling. All of the Mother's urine screens tested positive for barbiturates. There were concerns that the Mother had not appeared for some sessions and was not doing group sessions. The Mother denied using barbiturates.

(18) The Mother had provided proof of her income. She still planned to return to Florida as soon as the Child was returned to her custody. The Child was doing well in foster care. The Family Court found that the Child was dependent and should remain in DFS's custody. The Family Court also found that DFS was making reasonable efforts toward permanency for the Child. The Family Court deferred ruling on the motion to change goal, but warned the Mother that she need to improve her visitation with the Child significantly for reunification to occur.

(19) On November 20, 2017, the Family Court held another permanency review hearing. DFS asked to change the permanency plan to termination of parental rights for both parents. The second ICPC application for the Father had been denied because he failed to maintain contact with Washington officials. DFS did not have a working phone number for the Father.

(20) The Mother's visits were suspended for two weeks in September while DFS investigated an allegation that the Mother had threatened to kill the Child. After the investigation was closed and supervised visits resumed in mid-September, the Mother attended eleven out of seventeen scheduled visits. All of the missed visits

were attributable to the Mother. Foster care workers testified that some visits went well and others did not. The Child was often upset to leave the foster home and sometimes aggressive toward the Mother, which led to the Mother yelling at the Child and squeezing him too hard during one visit. The Mother would often fall asleep during visits, which she attributed to her work schedule.

(21) The DFS treatment worker testified that a parent aide was going to start working with the Mother during the visits and that the psychologist who previously evaluated the Mother was going to meet her again and observe how she was bonding with the Child. There was a fire at the Mother's residence, making it unsuitable for the Child. DFS was concerned that the Mother continued to live there despite warnings that it was unsafe. DFS was also concerned by what appeared to be self-inflicted cut marks on the Mother's wrists. Brandywine Counseling intended to discharge the Mother because she had not attended treatment services for more than a month. She continued to have urine screens that tested positive for barbiturates, but it was possible one of the psychiatric medications she took was causing false positive results.

(22) The Mother testified that she was seeing a former counselor at Connections for treatment. The Mother said she tried to inform DFS that she was receiving treatment at Connections, but was unable to do so. The Mother continued to clean houses with her mother and said she would provide evidence of that to DFS.

11

She also testified that she was living in a different house since the fire, but had not previously informed DFS of the change in her residence. She planned to return to Florida once the Child was returned to her.

(23) DFS sought to change the goal to termination of parental rights because the Child had been in DFS's care for an extended period, the Mother's visitation with the Child was erratic, and there were still concerns about her mental health. The Family Court judge deferred ruling on DFS's motion to change the goal because she wanted to learn more about the Mother's progress at Connections, the impact of parent-aide services, and the results of the psychologist's bonding assessment.

(24) On February 5, 2018, the Family Court held another permanency review hearing. A psychiatrist testified regarding the different drugs that she had prescribed for the Mother's anxiety. One of those medications could have caused false positive results for barbiturates. She testified that the Mother's current medication was working and that the Mother was compliant with her mental-health treatment. The Mother's counselor at Connections testified that the Mother was compliant and engaged with her treatment, which included individual and group sessions. Her urine screens were negative for drugs, but there were only three screens in Connections' system.

(25) The psychologist who originally evaluated the Mother testified regarding his reevaluation of the Mother in November 2017, which included

12

observing her with the Child for ninety minutes. He testified that he remained concerned by some of the things she said and her vagueness regarding her mental health and mental-health treatment. Based on his observation of the Mother's interaction with the Child, he concluded that the Mother became easily frustrated with the Child and was more focused on her needs than the Child's needs. For example, the Mother insisted on watching a television show with the Child even though the Child was fidgeting, uninterested, and too young for the show.

(26) The Mother's responses to the Personality Assessment Inventory were highly defensive. The psychologist again diagnosed the Mother with an anxiety disorder, but testified that the Mother's high defensiveness and vague responses made it difficult to trust what she was saying and accurately determine the status of her mental health. Based on his evaluations of the Mother, the psychologist believed that the Mother was not sufficiently tuned into the Child's needs, there was a risk she could not provide adequate care for the Child, and it would not safe for the Child to be returned to the Mother's care at that time.

(27) A family interventionist testified regarding the eight visits she observed between the Mother and the Child. She spoke with the Mother about holding the Child too tightly, showing him movies that were more appropriate for adults than toddlers, and giving him artificial sweeteners as a treat. She also observed, and spoke to the Mother, about falling asleep during the visits.

13

(28) During a visit in January, she noticed that the Mother had bad burns, which the Mother said came from sleeping near a space heater. The family interventionist was concerned that if the Mother could sleep through something like that, then she could sleep through the Child needing assistance. Later in the month the Mother had more burn marks that she attributed to the space heater.

(29) The family interventionist also testified that she believed the Mother sometimes tried to avoid changing the Child's diapers. When the interventionist asked the Mother to bring larger diapers, she said that she should not have to because she was paying child support and the foster parents were receiving money. The Mother subsequently claimed she looked in several stores for the right size of diapers, but could not find them. The family interventionist said that the Mother tried, but sometimes struggled to deal with the Child when he was acting up and that she would get frustrated quickly. There were also times that the Mother did not recognize the Child was done with an activity like coloring or reading and would continue to do it by herself. Based on the testimony, it appears that the Mother attended ten of fifteen visits scheduled since the last hearing, although she only attended fifteen minutes of one of the visits, instead of the scheduled two hours. The Mother missed five visits, with three of the missed visits attributable to the Mother.

(30) The DFS treatment worker testified that the Child was usually reluctant to go to visits. She also testified that the Mother tried to make visits and that it is

not unusual for a parent to miss some visits. She expressed concern about the Mother's behavior during some of the visits as well as the visible burn marks. She testified that the Mother had asked about reducing the visits, but would not make the request in writing as DFS requested.

(31) In light of her doubts concerning the Mother's truthfulness and the limited number of urine screens since the last hearing, the treatment worker questioned whether the Mother was in compliance with the mental-health and substance-abuse portions of her case plan. She testified that the Mother had submitted evidence that she was cleaning houses with her mother and was in compliance with that portion of her case plan. DFS had determined that the Mother was living in a place appropriate for a child. DFS did not observe any space heaters in the house, despite the testimony that the Mother suffered burns from a space heater.

(32) The treatment worker testified that the maternal grandmother had expressed concerns regarding the Child's safety with the Mother. Despite the Mother's progress on some elements of her case plan, DFS still wished to change the goal to termination of parental rights and adoption because DFS remained concerned that the Child would not be safe in the Mother's care and the Child had been in DFS's custody for a long time.

(33) The Mother testified that she sought medical care for the burns after learning there were concerns about what happened. She removed the space heaters. She also testified about her mental-health and substance-abuse treatment. She said that she had asked about changing the dates and times of the visits, not reducing the number of visits. She felt as though the visits were going well and planned to return to Florida when the Child was returned to her.

(34) At this point, the Family Court granted DFS's motion to change the plan from reunification to termination of parental rights for purposes of adoption. The Family Court found that the Mother had made insufficient progress on her case plan, despite having been given additional time and parent-aide resources. In the court's view, the Mother continued to display parenting deficiencies and lacked understanding of the Child's needs. There was conflicting testimony regarding the Mother's mental health. The Family Court expressed concern that, even if trial home placement of the Child with the Mother was appropriate in a few months, the Mother was likely to flee to Florida with the Child.

(35) An initial termination of parental rights hearing was held on June 4, 2018, but was continued until September because the Mother was receiving treatment for an MRSA infection and sepsis at Johns Hopkins Medical Center. The father had not responded to his counsel's communications or had any contact with

DFS. The father had received the petition for termination of parental rights, but did not appear for the hearing.

(36) The foster care worker testified that the Child was healthy, but displayed aggressive behavior toward other children in the foster care home since the arrival of a new baby. The worker also testified that, since the change in goal, the Mother had visitation once a month with the Child. The visit in March went fine, but the Mother did not schedule a visit in April because she was helping a sick friend. At the May visit, the Mother could barely walk.

(37) On September 17, 2018, the Family Court held a termination of parental rights hearing. All of the Family Court's previous orders were admitted into evidence, as well as a TPR Social Report prepared by DFS. A physician from Nanticoke Memorial Hospital testified that the Mother's behavior during a visit to the emergency room in May 2018 for a sepsis infection led to police involvement. The Mother became belligerent when a nurse confronted her about something she was taking that she would not identify as required by hospital policy. During a search, the police found syringes and a spoon in the Mother's purse. The Mother left the hospital against the doctor's medical advice. The doctor testified that a serious infection could affect a person's mental cognition and abilities, but he did not think that was the case with the Mother based on his interactions with her. A

17

police officer testified that the Mother was charged with disorderly conduct and possession of drug paraphernalia.

(38) A foster care worker testified that the Mother visited with the Child in March and May, but did not schedule a visit in April. Both visits were fine. She testified that in early September the Mother had called to tell her that she was out of the hospital and to ask whether the Child was with the same foster care family. The worker informed her that the Child was with a different family and gave her the phone number of the new worker handling the case. The Child was moved to a different family in mid-June because his previous family was unable to cope with caring for three children under the age of five.

(39) The new foster care worker testified that the Child was doing well in his new foster care home where he was the only child. When she spoke to the Mother during the first week of September, she gave the Mother the number of the DFS permanency worker to contact and told her that the Child was with a new foster care family. The family was interested in adopting the Child. The foster care worker testified that the Mother did not ask how the Child was doing or for a visit with the Child. The foster care mother testified that the Child was doing well and very active.

(40) The DFS permanency worker testified that she spoke with the Mother for the first time at the termination of parental rights hearing. She did not communicate with the Mother while she was hospitalized or in rehabilitation and

18

played phone tag with the Mother after she was released from rehabilitation. The DFS worker testified that the Mother was not compliant with the visitation portion of her case plan, but had completed a parenting class. She was not aware of whether the Mother was currently employed or receiving any mental-health or substance-abuse treatment. She also did not know where the Mother resided.

(41) The maternal grandmother testified that the Mother was transferred from Johns Hopkins Medical Center to a rehabilitation center in Maryland. She was released from the rehabilitation center during the third week of August. The maternal grandmother testified that, as things occurred, she notified the Mother's counsel, who had permission to share that information with DFS while the Mother was in the hospital and rehabilitation center. The maternal grandmother was presently staying with the Mother at the house where the fire occurred. The man who owned the house had died and left it to the maternal grandmother. She had not decided what she was going to do with the house, but was going to let the Mother stay there indefinitely or sell the house and buy a smaller one for the Mother. The maternal grandmother testified that the Mother was not currently working.

(42) The Mother testified that after leaving Nanticoke Memorial Hospital in mid-May she went to Peninsula Regional Medical Center for two weeks. She then went to Johns Hopkins Medical Center because they had a program for people who do not accept blood transfusions. On June 14, 2018, she was transferred to a

rehabilitation center in Maryland. She was discharged from the rehabilitation center on August 23, 2018.

(43) The Mother testified that she could care for an active toddler. She had seen her Connections counselor twice since August 23, 2018. She intended to see a psychiatrist and return to cleaning houses with her mother. She admitted that she had not requested a visit with the Child after her discharge from rehabilitation.

(44) On December 7, 2018, the Family Court issued a decision terminating the parental rights of the Father and the Mother. As to the Mother, the Family Court found by clear and convincing evidence that the Mother had failed to plan adequately for the Child's needs under 13 *Del. C.* § 1103(a)(5). The Family Court found that the Child had been in DFS care for more than one year, that the Mother had failed to complete her case plan despite receiving additional time to do so, that her visitation with the Child was inconsistent, that she failed to demonstrate appropriate parenting skills during the visits, and that she was unable to assume promptly legal and physical custody of the Child or pay for his support in accordance with her financial means. The Family Court next considered the best-interest factors under 13 *Del. C.* § 722 and found, by clear and convincing evidence, that termination of parental rights was in the best interests of the Child.

(45)    On appeal, this Court reviews the Family Court's factual and legal determinations as well as its inferences and deductions.[3]  We will not disturb the Family Court's rulings on appeal if the court's findings of fact are supported by the record and its explanations, deductions, and inferences are the product of an orderly and logical reasoning process.[4]  We review legal rulings *de novo*.[5]  If the Family Court correctly applied the law, then our standard of review is abuse of discretion.[6]

(46)    The statutory procedure for terminating parental rights requires two separate inquiries.[7]  First, the Family Court must determine whether the evidence presented meets one of the statutory grounds for termination.[8]  When the statutory basis for termination of parental rights is failure to plan adequately for the child's needs under § 1103(a)(5) and the child is in DFS's custody, there must be proof of a least one additional statutory factor under § 1103(a)(5)(a) and proof that DFS made reasonable efforts to reunify the family.[9]  Second, the Family Court must determine whether termination of parental rights is in the best interests of the child.[10]  Both of these requirements must be established by clear and convincing evidence.[11]

---

[3] *Long v. Div. of Family Servs.*, 41 A.3d 367, 370 (Del. 2012).
[4] *In re Heller*, 669 A.2d 25, 29 (Del. 1995).
[5] *Id.*
[6] *CASA v. Dep't of Servs. for Children, Youth and Their Families*, 834 A.2d 63, 66 (Del. 2003).
[7] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).
[8] 13 *Del. C.* § 1103(a) (listing the grounds for termination of parental rights).
[9] *Powell v. Dep't of Servs. for Children, Youth & Their Families*, 963 A.2d 724, 731 (Del. 2008).
[10] 13 *Del. C.* § 722(a).
[11] *Powell*, 963 A.2d at 731.

(47) The Family Court did not err in finding, by clear and convincing evidence, a statutory basis for the termination of the Mother's parental rights. The record supports the Family Court's conclusion that the Mother failed to plan adequately for the Child's needs and that the Child was in DFS's custody for more than a year. The Mother's failure to plan included her inconsistent visitation with the Child and her lack of parenting skills, even after completion of a parenting class and receipt of parent-aide services. DFS reduced visitation to once a month after the change in goal in February 2018, but the Mother still only visited the Child twice between February 2018 and September 2018. She was in the hospital and a rehabilitation center for much of the summer, but there is no indication that she asked or tried to have any contact with the Child during that time. Even after the Mother was released from rehabilitation, she did not ask how the Child was doing or for a visit with the Child. The Mother had the opportunity to explain her failure to visit the Child regularly on appeal, but failed to submit anything for this Court to consider.

(48) Although the Family Court did not expressly address whether DFS made reasonable efforts to reunify the Mother with the Child in the termination of parental rights order, it did note that it had made this finding throughout the dependency proceedings. DFS's reunification efforts included developing a case plan for the Mother, helping the Mother obtain the necessary services to complete the case plan, facilitating the Child's visits with the Mother (even though the Mother

22

often failed to take advantage of this opportunity), and providing the Mother with parent-aide services. DFS even asked for the Mother to have extra time to complete her case plan. The record therefore supports a finding that DFS made reasonable efforts to reunify the Mother with the Child.

(49) The Family Court found that all but one of the best-interests factors under § 722 weighed in favor of the termination of parental rights. Although we conclude that the Family Court erred in its consideration of one of the best-interests factors (the wishes of the parents), the Family Court did not err in concluding that termination of the Mother's parental rights was in the Child's best interests. The Family Court found that the first factor—the wishes of the Mother—weighed in favor of termination of parental rights because the Mother, who opposed termination of her parental rights, failed to complete her case plan. We disagree. In light of the Mother's opposition to the termination of her parental rights, this factor weighed against termination of her parental rights. The Mother's failure to complete her case plan is already accounted for by the sixth best-interests factor—the parents' past and present compliance with their rights and responsibilities to their child under 13 *Del. C.* § 701.

(50) The Family Court did not err in concluding that the second factor—the Child's wishes—weighed in favor of termination of parental rights. Although the Child was too young for a court interview, the Child's attorney *ad litem* supported

23

the termination of parental rights. As to the third factor—the Child's interaction and interrelationship with his relatives—the Family Court did not err in finding that the Mother's irregular visitation and deficient parenting skills meant this factor weighed in favor of termination of parental rights. The Family Court's finding that the fourth factor—the Child's adjustment to his home and community—weighed in favor of termination of parental rights is well-supported by the record. The Child was doing well with his foster care family, which was an adoptive resource.

(51) The Family Court's conclusion that the fifth factor—the mental and physical health of all individuals involved—weighed in favor of termination of parental rights is also well-supported by the record. The serious issues regarding the Mother's mental health and physical health were litigated throughout the dependency proceedings. As to the sixth factor—the parents' compliance with their rights and responsibilities under 13 *Del. C.* § 701—the Family Court did not err in concluding that the Mother's failure to complete her case plan and inconsistent visitation meant this factor weighed in favor of termination of parental rights. The Family Court did not err in finding that the seventh factor—evidence of domestic violence—was neutral because there was no evidence of domestic violence presented.

(52) Finally, the Family Court found that the eighth factor—the criminal history of the parents—weighed in favor of the termination of the Mother's parental

24

rights because she had pending misdemeanor charges (disorderly conduct and possession of drug paraphernalia) arising from the incident at Nanticoke Memorial Hospital and a traffic violation. In light of the limited and relatively minor nature of these offenses, we question the Family Court's conclusion that this factor weighed in favor of termination parental rights. At most, it seems to us that the Mother's misdemeanor offenses made this factor neutral as to the termination of parental rights.

(53) Notwithstanding the Family Court's error as to the first best-interests factor, we conclude that the Family Court did not err in concluding that termination of the Mother's parental rights was in the Child's best interests. When balancing the relevant factors, the Family Court may give different weight to different factors.[12] Even with the Mother's wishes weighing against termination of parental rights and her criminal history a neutral factor, the weight of the factors in favor of termination of parental rights (the second, third, fourth, fifth, and sixth factors) support the Family Court's finding, by clear and convincing evidence, that termination of the Mother's parental rights was in the Child's best interests.

(54) The Family Court found by clear and convincing evidence that the Mother's parental rights should be terminated. After careful consideration of the

---

[12] *Bower v. Dep't of Servs. for Child, Youth & Their Families*, 2016 WL 3382353, at *4 (Del. June 9, 2016) (citing *Fisher v. Fisher*, 691 A.2d 619, 623 (Del. 1997)).

25

parties' positions and the record on appeal, including the transcripts of all of the Family Court hearings, we conclude that the Mother's appeal is wholly without merit. We are also satisfied that the Mother's counsel has made a conscientious effort to examine the record and the law and has properly determined that the Mother could not raise a meritorious claim in this appeal. The Mother was given an opportunity to, but did not, challenge this determination. We therefore affirm the Family Court's termination of parental rights.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED. The motion to withdraw is moot.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

26