IN THE SUPREME COURT OF THE STATE OF DELAWARE

DOUGLAS PRINCE-WILKS,[1]    §
   § No. 39, 2025
     Respondent Below,    §
     Appellant,    § Court Below–Family Court
   § of the State of Delaware
     v.    §
   § File Nos. 24-04-06TN
DEPARTMENT OF SERVICES    §      CN23-01595
FOR CHILDREN, YOUTH AND    §
THEIR FAMILIES,    § Petition Nos. 24-08454
   §      23-03572
     Petitioner Below,    §
     Appellee.    §

Submitted: July 31, 2025
Decided: September 5, 2025

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

## <u>ORDER</u>

After consideration of the no-merit brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26.1(c), the responses thereto, and the Family Court record, it appears to the Court that:

---

[1] The Court previously assigned a pseudonym to the appellant under Supreme Court Rule 7(d).

(1)     By order dated January 2, 2025, the Family Court terminated the parental rights of the appellant, Douglas Prince-Wilks ("Father"), in his daughter, born in October 2021 (the "Child").[2]  Father appeals.

(2)     On appeal, Father's counsel has filed an opening brief and a motion to withdraw under Rule 26.1(c).  Counsel asserts that he has conducted a conscientious review of the record and the relevant law and has determined that Father's appeal is wholly without merit.  Counsel informed Father of the provisions of Rule 26.1(c), provided him with a copy of counsel's motion to withdraw and the accompanying brief, and advised him that he could submit in writing any additional points that he wished for the Court to consider.  Father has submitted arguments for the Court's consideration.  The Delaware Department of Services for Children, Youth and Their Families (DSCYF) as the appellee and the Child's attorney from the Office of the Child Advocate (OCA) have responded to counsel's Rule 26.1(c) brief and argue that the Family Court's judgment should be affirmed.

(3)     On February 28, 2023, DSCYF petitioned for emergency custody of the Child after Father's four-year-old daughter (the "Deceased Child") died under suspicious circumstances while in Father's care.

---

[2] The Family Court's order also terminated the parental rights of the Child's mother, a decision we recently affirmed. *Leroy v. Dep't of Servs. for Children, Youth and Their Families/Div. of Family Servs.*, 2025 WL 1604406 (Del. June 6, 2025). We refer only to facts in the record that relate to Father's appeal.

(4)     With the filing of DSCYF's dependency-and-neglect petition, the mandated hearings ensued.[3]  At the preliminary protective hearing, the Family Court found that the Child remained dependent in Father's care based on the Deceased Child's unexplained death and the ongoing police investigation into Father's possible role in her death.  At the adjudicatory hearing, the evidence showed that the Deceased Child had been in good health when she came to live with Father in October 2022.  At the time of her death, however, the Deceased Child had lost a significant amount of weight and had wounds, marks, scars, discoloration, and depigmentation such that the examining physician concluded that the injuries had been intentionally inflicted.  At the conclusion of the hearing, the Family Court found that the Child remained dependent in Father's care.

(5)     In May 2023, DSCYF developed a case plan to facilitate Father's reunification with the Child.  Father's case plan required him to: (i) undergo a psychological evaluation and follow all treatment recommendations; (ii) undergo a substance abuse evaluation and follow all recommended treatments; (iii) obtain and maintain stable employment and housing; (iv) complete a parenting class; (v) complete a domestic violence class; (vi) work with a family interventionist to,

_____

[3] When a child is removed from his home by DSCYF and placed in foster care, the Family Court is required to hold hearings at regular intervals under procedures and criteria detailed by statute and the court's rules. 13 *Del. C.* § 2514; Del. Fam. Ct. Civ. Proc. R. 212-219.

among other things, create a budget; and (vii) visit regularly and appropriately with the Child.

(6) As of the August 10, 2023 review hearing, Father's visits with the Child's half-siblings had been terminated after they made troubling revelations about abuse during therapy. Father was living in Pennsylvania and had made little progress on his case plan. Father had enrolled in a parenting class, but he had not undergone either a psychological or substance abuse evaluation. Father claimed to be working but had not provided proof of employment to DSCYF. Notably, the police investigation into the Deceased Child's death was still pending, and Father had not provided an explanation to DSCYF for her injuries. At the conclusion of the hearing, the Family Court found that the Child remained dependent in Father's care because the issues present when DSCYF petitioned for emergency custody of the Child had not been resolved.

(7) As of the November 14, 2023 review hearing, Father had made some progress on his case plan: he had completed a parenting class and a substance abuse evaluation, was employed, had made efforts to schedule a psychological evaluation, and had been enjoying regular visits with the Child. But the circumstances of the Deceased Child's death remained under investigation, and Father was still living in Pennsylvania. Because DSCYF did not support Father assuming custody of the Child, it had not sought approval of Father's residence under the Interstate Compact

4

on the Placement of Children ("ICPC"), which was required before the Child could be placed with Father. In its order finding that the Child remained dependent in Father's care, the court noted that Father's counsel could assist him with seeking ICPC approval of his Pennsylvania residence.

(8) In February 2024, the Family Court conducted a paper review of the dependency-and-neglect proceedings. Father continued to make some progress on his case plan. Specifically, Father (i) had undergone a substance abuse evaluation and been recommended for outpatient treatment; (ii) had an upcoming psychological evaluation scheduled with Dr. Rachel Brandenburg; (iii) had reportedly undergone a mental health evaluation for an open dependency-and-neglect case involving another one of his children in New Jersey; (iv) was employed at Wawa; (v) had been engaged with a family interventionist; and (vi) was enjoying regular and appropriate visits with the Child, who was placed with a maternal relative in New Jersey. Yet the Deceased Child's death had been declared a homicide, and criminal charges against Father were being reviewed by the Department of Justice. And Father, who had relocated to New Jersey and was living in a hotel room, lacked stable housing.

(9) On March 8, 2024, DSCYF moved to change the permanency goal from reunification to termination of parental rights (TPR) for the purpose of adoption. The Family Court held a two-day permanency hearing in April 2024. The Child had been returned to foster care in Delaware in early February, and Father, who was still

5

residing in New Jersey, had not had an in-person visit with the Child since. Nor had Father completed his case plan: (i) a psychological evaluation had been re-scheduled for a second time but had not yet taken place; (ii) Father had not provided DSCYF with proof that he was participating in substance abuse outpatient therapy; (iii) Father had an outstanding capias; (iv) Father was still the subject of an ongoing criminal investigation concerning the death of the Deceased Child; (v) Father had neither provided DSCYF with proof of employment nor completed a budget; and (vi) Father, who was living in a hotel, had not secured stable housing. Following the permanency hearing, the Family Court granted DSCYF's motion to change the permanency goal in part and changed the permanency goal from reunification to the concurrent goals of reunification and TPR for the purpose of adoption. Thereafter, DSCYF moved to terminate Father's parental rights on the two grounds: (i) his failure to plan for the Child's physical needs or mental and emotional health and development, and (ii) the unexplained death or serious injury of the Deceased Child under circumstances indicating that the death or serious injury resulted from Father's intentional or reckless conduct or willful neglect.

(10) After two continuances granted at Father's request, the Family Court held a two-day TPR hearing in December 2024. Relevant to Father's appeal,[4] the Family Court heard testimony from Dr. Brandenburg; Father's family interventionist

---

[4] The TPR hearing also involved the Child's half-siblings and their father.

6

with New Behavioral Network; the Child's half-siblings' therapist; Dr. Louis Finelli, the assistant medical examiner who declared the Deceased Child's death a homicide; Father; Father's DSCYF treatment worker; the Child's mother; the Child's DSCYF permanency worker; the Child's foster mother; and the Child's court-appointed special advocate. The testimony fairly established that it was difficult for DSCYF to provide services to Father because he was not living in Delaware during the dependency-and-neglect proceedings. And although Father claimed that he was working with child protective services in New Jersey to complete his case plan, he had not provided DSCYF with proof that he had completed any elements of his case plan other than the parenting class. Dr. Finelli testified that the Deceased Child died from a combination of maltreatment and acute and chronic blunt force injuries to the head. Dr. Finelli's physical examination of the Deceased Child revealed that she had many injuries in various stages of healing—evidence that she had sustained the injuries over a period of time. The injuries included several brain bleeds as well as numerous visible injuries that appeared to be burns or wounds inflicted by a looped electrical cord. In Dr. Finelli's opinion, the Deceased Child was also malnourished as a result of maltreatment. The Child's half-siblings' therapist testified that they had disclosed abuse—specifically, the withholding of food and other severe punishments—at the hands of Father and the Child's mother. Finally, the evidence

7

showed that the Child was thriving in her placement, which was an adoptive resource.

(11) Following the hearing, the Family Court issued a written decision terminating Father's parental rights in the Child because of his failure to plan and the unexplained death of the Deceased Child while in Father's care. This appeal followed.

(12) On appeal, this Court is required to consider the facts and the law as well as the inferences and deductions made by the Family Court.[5] We review legal rulings *de novo*.[6] We conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly erroneous.[7] If the trial judge has correctly applied the law, then our standard of review is abuse of discretion.[8] On issues of witness credibility, we will not substitute our judgment for that of the trier of fact.[9]

(13) The statutory framework under which the Family Court may terminate parental rights requires two separate inquiries.[10] First, the court must determine whether the evidence presented meets one of the statutory grounds for termination.[11]

---

[5] *Wilson v. Div. of Family Servs.*, 988 A.2d 435, 439-40 (Del. 2010).
[6] *Id.* at 440.
[7] *Id.*
[8] *Id.*
[9] *Wife (J.F.V.) v. Husband (O.W.V., Jr.)*, 402 A.2d 1202, 1204 (Del. 1979).
[10] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).
[11] *Id.* at 537.

When the statutory basis for termination is failure to plan, the Family Court must also find proof of at least one additional statutory condition.[12] If the Family Court finds a statutory basis for termination of parental rights, the court must then determine whether, under 13 *Del. C.* § 722, severing parental rights is in the child's best interest.[13] Both of these requirements must be established by clear and convincing evidence.[14]

(14) Here, the Family Court found that DSCYF had proved, by clear and convincing evidence, that the termination of Father's parental rights was appropriate because of his failure to plan[15] and the Child had been in DSCYF custody for more than one year.[16] The Family Court also found, by clear and convincing evidence, that termination of Father's parental rights was appropriate because of the Deceased Child's unexplained death or serious injury under circumstances indicating that the death or serious injury resulted from Father's intentional or reckless conduct or willful neglect.[17] The Family Court then examined the best-interests factors set out in 13 *Del. C.* § 722 and found, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interest.

---

[12] 13 *Del. C.* § 1103(a)(5)(a)-(e) (listing additional conditions).

[13] *Shepherd*, 752 A.2d at 536-37.

[14] *Powell v. Dep't of Servs. for Children, Youth and Their Families*, 963 A.2d 724, 731 (Del. 2008).

[15] 13 *Del. C.* § 1103(a)(5).

[16] *Id.* § 1103(a)(5)(a).

[17] *Id.* § 1103(a)(9).

9

(15) In the points that Father has submitted for the Court's consideration, Father argues that the evidence did not support a finding that the Deceased Child's death was a result of mistreatment and that the Child's half-siblings accused their mother, not him, of inappropriate touching. In short, Father argues that DSCYF did not prove a statutory basis for the termination of his parental rights by clear and convincing evidence. Father's arguments are unpersuasive.

(16) In support of his position that DSCYF failed to prove that termination of his rights was appropriate based on the Deceased Child's unexplained death or serious injury, Father contends that the Deceased Child's brain bleeds could be explained by seizure activity or her prior hospitalization for a skull fracture. Although Dr. Finelli did testify that seizure activity could cause brain bleeds and acknowledged that the Deceased Child been previously hospitalized for a depressed skull fracture at birth, the evidence showed that the Deceased Child did not have a history of seizures and that she was closely monitored following her discharge from the neonatal intensive care unit, with no signs of developmental delays. Father also overlooks the fact that the Child was covered with visible and unexplained bite, burn, and ligature marks highly suggestive of systemic abuse. Finally, Father's suggestion that his lack of a criminal record involving similar claims of abuse undermines the Family Court's finding is simply incorrect. Simply put, DSCYF presented ample evidence to support the Family Court's finding that the Deceased Child suffered

10

unexplained seriously physical injury or death under circumstances indicating that the injuries or death resulted from Father's intentional or reckless conduct or willful neglect. Turning to Father's assertion that the Child's half-siblings accused their mother, and not him, of inappropriate touching, the Family Court did not cite any the allegations of inappropriate touching to support either ground for granting DSCYF's TPR petition. Accordingly, Father's claim, assuming its truth, does not constitute reversible error.

(17) Having carefully reviewed the parties' positions and the record on appeal, we find that the Family Court's factual findings are supported by the record, and we can discern no error in the court's application of the law to the facts. We therefore conclude that Father's appeal is wholly without merit and devoid of any arguably appealable issues. We are satisfied that Father's counsel made a conscientious effort to examine the record and the law and properly determined that Father could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court be AFFIRMED. Counsel's motion to withdraw is moot.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

11