IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALEX STORM,[1] | § | |
| | § | No. 242, 2025 |
| Respondent Below, | § | |
| Appellant, | § | Court Below–Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | File Nos. 24-02-07TN |
| DEPARTMENT OF SERVICES | § | CN13-03262 |
| FOR CHILDREN, YOUTH AND | § | |
| THEIR FAMILIES, DIVISION OF | § | Petition Nos. 24-03280 |
| FAMILY SERVICES, | § | 23-20260 |
| | § | |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: October 13, 2025
Decided: October 31, 2025

Before **SEITZ**, Chief Justice; **LEGROW** and **GRIFFITHS**, Justices.

### ORDER

After consideration of the no-merit brief and the motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26.1(c), the responses, and the Family Court record, it appears to the Court that:

(1)    By order dated May 13, 2025, the Family Court terminated the parental rights of the appellant, Alex Storm ("Father"), with respect to his daughter, born in November 2018 (the "Child").  Father appeals.

---

[1] The Court previously assigned a pseudonym to the appellant under Supreme Court Rule 7(d).

(2)     On appeal, Father's counsel filed an opening brief and a motion to withdraw under Rule 26.1(c).  Counsel asserts that she conducted a conscientious review of the record and the relevant law and determined that Father's appeal is wholly without merit.  Counsel informed Father of the provisions of Rule 26.1(c), provided him with a copy of the motion to withdraw and the accompanying brief, and advised him that he could submit in writing any additional points that he wished for the Court to consider.  Father submitted points for the Court's consideration.  The Delaware Department of Services for Children, Youth and Their Families, Division of Family Services ("DFS") as the appellee and the Child's attorney have responded to counsel's Rule 26.1(c) brief and argue that the Family Court's judgment should be affirmed.

(3)     Before her death in 2019, the Child's mother ("Mother") consented to her mother ("Maternal Grandmother") having guardianship of the Child and her siblings.  Mother provided Father's name, but his name did not appear on the Child's birth certificate and his paternity was not established in the guardianship proceeding.  On September 22, 2023, DFS petitioned for emergency custody of the Child because there were reports of Maternal Grandmother physically abusing one of the Child's siblings.  Father's whereabouts were unknown, and Maternal Grandmother refused to provide his contact information.  The Family Court granted the petition.

(4) With the filing of DFS's dependency-and-neglect petition, the mandated hearings ensued.[2] At the preliminary protective hearing, the Family Court found that there was probable cause to believe the Child was dependent due to the abuse allegations against Maternal Grandmother, Mother's death, and the unknown whereabouts of Father. The court also found that DFS had made reasonable efforts to prevent the unnecessary removal of the Child from the home. The court rescinded the Maternal Grandmother's guardianship.

(5) At the adjudicatory hearing, evidence was presented that the Child was doing well in foster care, but there were concerns that the Child had speech and cognitive delays. The foster mother had been appointed the Child's Educational Surrogate Parent. The Family Court found that the Child remained dependent as to Father, whose whereabouts remained unknown, and deceased Mother. The court ordered the accomplishment of service on Father through publication on the Family Court website. On November 6, 2023, Father was served with DFS's custody petition by publication on the Family Court website.

(6) At the dispositional hearing, the Family Court found that the Child remained dependent, and that DFS was making reasonable efforts toward the

---

[2] When DFS obtains custody of a child, the Family Court is required to hold hearings at regular intervals under procedures and criteria detailed by statute and the court's rules. 13 *Del. C.* § 2514; Del. Fam. Ct. Civ. Proc. R. 212-219.

3

permanency plan of reunification. No case plan was created for Father because DFS had been unable to contact him.

(7) On January 23, 2024, DFS moved to change the permanency plan to termination of parental rights ("TPR") and adoption. DFS argued that Father's paternity had not been established, DFS had been unable to contact him, and Father had failed to participate in the previous proceedings for the Child. The Family Court granted the motion. At the February 6, 2024 review hearing, evidence was presented that the Child continued to do well with her foster family, an adoptive resource for the Child. The Family Court adopted DFS's care plan for the Child, which reflected that the Child had been diagnosed with anemia, developmental delay, chromosomal microduplication, and urinary incontinence.

(8) On February 13, 2024, DFS filed a petition for termination of Father's parental rights based on intentional abandonment under 13 *Del. C.* § 1103(a)(2), unintentional abandonment under 13 *Del. C.* § 1103(a)(3), and failure to plan under 13 *Del. C.* § 1103(a)(5). Because Father's paternity had not been determined, DFS also sought termination of an unknown father's parental rights. A hearing on the petition was scheduled for May 28, 2024.

(9) At a May 2, 2024 review hearing, the DFS permanency worker testified that she received a voice mail from Father during the hearing. Otherwise, the Child

4

continued to do well with her foster family. The Child had recently been diagnosed with autism.

(10) Shortly after the review hearing, Father communicated with DFS for the first time. He claimed that he had been unaware the Child was in DFS custody and that Maternal Grandmother had provided inaccurate contact information for him. Father wanted the Child in his care. Based on Father's contact, DFS moved for paternity testing. The Family Court granted the motion and cancelled the May 28, 2024 hearing. Paternity testing established Father's paternity of the Child. The Family Court appointed counsel to represent Father and scheduled a permanency hearing for November 1, 2024.

(11) At the November 1, 2024 hearing, Father testified that he never had custody of the Child. He, Mother, and Maternal Grandmother agreed shortly after the Child's birth that Maternal Grandmother would care for her until he and Mother could do so. Mother subsequently died, and Father visited the Child every few weeks. Maternal Grandmother rejected Father's request for custody of the Child in 2020. He did not file for custody at that time because he did not want to cause Maternal Grandmother stress and he believed they could work things out.

(12) Father continued visiting the Child until approximately March 2022 when Maternal Grandmother stopped responding to his texts and calls. He again did not seek custody of the Child, testifying that he was unable to work due to a

5

workplace injury, lost his car and housing, and developed a drinking problem. Father entered substance abuse treatment in August 2023.

(13) Father learned from Maternal Grandmother in October 2023 that the Child was in DFS custody. He gave his contact information to Maternal Grandmother. Based on his conversation with Maternal Grandmother, Father thought the Child would be back in the Maternal Grandmother's care shortly. He did not contact DFS or file anything in the Family Court. In May 2024, DFS contacted Father's sister, who informed Father.

(14) Father testified that he was employed and provided pay stubs from September and October 2024. The pay stubs reflected an address where Father claimed he had not lived since 2022 and where notice of the TPR petition was sent. Father also provided a copy of the lease for where he was living in Pennsylvania. Father indicated that he was willing to case plan with DFS.

(15) The DFS permanency worker testified that weekly Zoom visits between the Child and Father were scheduled once Father's paternity was established. Father attended three visits, but missed seven visits. The Child struggled with the Zoom visits, having meltdowns when Father failed to appear and appearing uncomfortable when the visits occurred. DFS had been unable to initiate the Interstate Compact on the Placement of Children ("ICPC") process until recently because Father had not provided his housing information. The Child was doing well with her foster family,

and DFS wished to proceed with termination of Father's parental rights. The Family Court denied Father's request to change the permanency goal to reunification, but ordered DFS to case plan with Father. A TPR hearing was originally scheduled for March 3, 2025, but was rescheduled for May 13, 2025.

(16) At the TPR hearing, the Family Court heard testimony from the DFS permanency worker, the Child's foster mother, and Father. Documentary evidence included the orders in the dependency proceeding. Father had not visited the Child since an in-person visit on November 15, 2024. The Child was very upset before the visit, but was fine during the visit. Father did not communicate with the permanency worker between December 13, 2024 and May 12, 2025. In March, the permanency worker was informed that Pennsylvania had closed the ICPC matter because Father was uncooperative and unemployed.

(17) The permanency worker wished to prepare a case plan with Father, but after he stopped communicating with her, she prepared and sent a case plan to Father in January. The case plan required Father to: (i) complete a substance abuse evaluation and follow all recommended treatments; (ii) complete a mental health evaluation and follow any recommendations; (iii) engage in meaningful visitation with the Child; (iv) obtain and maintain stable employment and housing as well as cooperate with the ICPC process; and (v) comply with the terms of his probation in Pennsylvania.

(18) Father told DFS that he had completed substance abuse treatment and provided a certificate of completion, but DFS was unable to verify this information. Substance abuse treatment was a component of Father's probation for DUI and traffic offenses he committed in November 2021 and pleaded guilty to in October 2022. Continuation of mental health treatment was also a component of Father's probation. DFS did not receive any documentation from Father concerning his mental health treatment. During the hearing, a substance abuse evaluation performed in March 2024 and a mental health evaluation performed in March 2025 were admitted into evidence. The substance abuse evaluation did not recommend further treatment. As to the mental health evaluation, Father had engaged in weekly counseling since March.

(19) The permanency worker testified that Father never asked her how the Child was doing or attended any of the Child's medical appointments. He had not provided any pay stubs to DFS since the November hearing or provided any information about the status of his probation. Father's pay stubs from a job he held in November were admitted into evidence. The permanency worker had a copy of Father's lease, but no home assessment was completed during the ICPC process. DFS had concerns about domestic violence because Father's Pennsylvania criminal records, which DFS did not have until after preparation of the case plan, showed that Father pleaded guilty to harassment of his ex-girlfriend in 2024.

8

(20) The Child was doing well in foster care and wanted to stay with her foster family. The foster mother testified that the Child did not mention Father before the Zoom visits and did not ask about him after the in-person visit. Father never asked the foster mother about how the Child was doing. The foster family wanted to adopt the Child.

(21) Father testified that he had been sober for more than 600 days. He lost his job in December, but had started a new, full-time job the day before the hearing. He was living in the same apartment that he lived in at the time of the last hearing. At one point in time he was behind on his rent, but his sister helped him pay it off. He understood from the ICPC worker that no home assessment would be done until he was employed and that a home assessment would be done now that he was employed. According to Father, his probation would end in December.

(22) As to visitation with the Child, Father testified that he stopped doing Zoom visits because they upset the Child. He acknowledged that he was offered in-person visitation, but claimed he had car problems in January that prevented him from coming to Delaware. He did not inform DFS that he was having transportation issues. Father testified that Maternal Grandmother deprived him of the opportunity to parent the Child but admitted that he did not pursue any court action. At the end of the hearing, the Family Court terminated Father's parental rights on the grounds

9

of unintentional abandonment under Section 1103(a)(3) and failure to plan under Section 1103(a)(5).

(23) This Court's review of the Family Court's decision to terminate parental rights entails consideration of the facts and the law as well as the inferences and deductions made by the Family Court.[3] We review legal rulings *de novo*.[4] We conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly wrong.[5] If the trial judge has correctly applied the law, then our standard of review is limited to abuse of discretion.[6]

(24) The statutory framework under which the Family Court may terminate parental rights requires two separate inquiries.[7] First, the court must determine whether the evidence presented meets one of the statutory grounds for termination.[8] Second, if the Family Court finds a statutory basis for termination of parental rights, the court must determine whether, under 13 *Del. C.* § 722, severing parental rights is in the child's best interest.[9] Both of these requirements must be established by clear and convincing evidence.[10]

---

[3] *Wilson v. Div. of Family Servs.*, 988 A.2d 435, 439-40 (Del. 2010).
[4] *Id.* at 440.
[5] *Id.*
[6] *Id.*
[7] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).
[8] *Id.* at 537.
[9] *Shepherd*, 752 A.2d at 537.
[10] *Powell v. Dep't of Servs. for Children, Youth and Their Families*, 963 A.2d 724, 731 (Del. 2008).

(25) Here, the Family Court found that Father unintentionally abandoned the Child by failing to do all of the following for at least twelve consecutive months of the eighteen months preceding the filing of the TPR petition on February 12, 2024: (i) communicate with or regularly visit the Child beginning in March 2022; (ii) file a petition to establish paternity or a legal right to have contact or visitation with the Child; and (iii) manifest an ability and willingness to assume legal and physical custody of the Child.[11] Although the court did not perform a complete analysis of whether additional evidence of unintentional abandonment existed under Section 1103(a)(3)(b),[12] the record reflects that the Child was not in the other parent's custody and Father was unable to assume legal and physical custody of the Child promptly and pay reasonable support for the child as set forth in Section 1103(a)(3)(b)(1). The Child was in DFS custody, Father had barely seen the Child since March 2022, Father had only recently obtained full-time employment, and the ICPC process, including an assessment of Father's home, was incomplete.

(26) The court also found that Father failed to plan for the Child's needs and that the Child had been in DFS custody for more than one year.[13] The court recognized that Father had completed some elements of his case plan but emphasized that Father had failed to engage in meaningful visitation with the Child. Despite not

---

[11] 13 *Del. C.* § 1103(a)(3)(a) (listing the elements of unintentional abandonment).
[12] *Id.* § 1103(b) (listing the additional grounds required for a finding of unintentional abandonment)
[13] *Id.* § 1103(a)(5) (defining the elements of failure to plan).

11

seeing the Child between March 2022 and August 2024 and desiring custody of the Child, Father did only one in-person visit and a few Zoom visits with the Child between September 2024 and November 15, 2024. Father had no contact with the Child after November 15, 2024.

(27) Considering the best interest factors,[14] the court found that factors two (the child's wishes), three (the child's relationship with her parents and relatives), four (the child's adjustment to home, school, and the community), and six (the parents' past and presence compliance with their rights and responsibilities to the child) carried the greatest weight. The record demonstrated that the Child was doing well with her foster family and wished to stay there, she had no relationship with Father and had strong bonds with her foster family, and Father had not met his parental responsibilities since at least March 2022. The court concluded that termination of the Father's parental rights was in the Child's best interests. The Family Court's written order reflects that it made the necessary findings by clear and convincing evidence.

(28) In the points that Father has submitted for the Court's consideration, he states that he visited the Child and bought her clothing and other essentials while she was in the care of her Maternal Grandmother. He claims that he could not seek

---

[14] *Id.* § 1103(a) (providing that parental rights may be terminated if one of several statutory grounds is established and termination "appears to be in the child's best interest"); *id.* § 722 (setting forth factors that the court may consider when determining the best interests of a child).

custody of the Child after Maternal Grandmother rejected his request for custody in 2020 because "the courts were closed for many years due to Covid."[15] Father also contends that he did not have a fair shot in court to maintain his parental rights.

(29) Notwithstanding Father's claims, it is undisputed that the Child was never in Father's custody and that he had no contact with the Child for more than two years. Father submitted no evidence in the Family Court showing that he ever financially supported the Child. As to Father's assertion that he could not seek custody of the Child while the Family Court was closed due to COVID-19, the public could submit filings to the Family Court throughout the pandemic[16] and courthouses reopened to the public on June 15, 2020.[17] Finally, Father had a fair opportunity to maintain his parental rights. Even though Father knew in October 2023 that the Child was in DFS custody and took no action until May 2024, he had the opportunity to complete a case plan and demonstrate that he could meet the Child's needs. Father failed to do so, discontinuing contact with DFS and choosing not to see the Child for six months.

(30) Having carefully reviewed the parties' positions and the record on appeal, we hold that the Family Court's factual findings are supported by the record,

---

[15] Rule 26.1(c) Br. at 15-16.

[16] See Administrative Order No. 3 (Mar. 22, 2020) (closing courthouses to the public, but requiring the courts to provide a method, such as a drop box, email address, or mailing address for the public to fill out and file documents).

[17] See Administrative Order No. 7 (June 5, 2020) (providing that courthouses would reopen on June 15, 2020).

and we can discern no error in the court's application of the law to the facts. We therefore conclude that Father's appeal is wholly without merit and devoid of any arguably appealable issues. We are satisfied that Father's counsel made a conscientious effort to examine the record and the law and properly determined that Father could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court be AFFIRMED. Counsel's motion to withdraw is moot.

BY THE COURT:


*/s/ N. Christopher Griffiths*
Justice