IN THE SUPREME COURT OF THE STATE OF DELAWARE

ALLICE ROOTEN,[1]     §
    § No. 8, 2026
    Respondent Below,     §
    Appellant,     § Court Below–Family Court
    § of the State of Delaware
    v.     §
    § File No. 25-02-02-TN
DEPARTMENT OF SERVICES     § Petition No. 25-02410
FOR CHILDREN, YOUTH AND     §
THEIR FAMILIES,     §
    §
    Petitioner Below,     §
    Appellee.     §

Submitted: May 4, 2026
Decided: June 8, 2026

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

### ORDER

After consideration of the no-merit brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26.1(c), the responses thereto, and the Family Court record, it appears to the Court that:

(1) By order dated December 5, 2025, the Family Court terminated the parental rights of the appellant, Allice Rooten ("Mother"), in her sons, Conner (born

---

[1] The Court previously assigned a pseudonym to the appellant under Supreme Court Rule 7(d).

October 2015), Alexander (born May 2018), Jason (born May 2020), and Jackson (born October 2021) (the "Children").[2] Mother appeals.

(2) On appeal, Mother's counsel has filed an opening brief and a motion to withdraw under Rule 26.1(c). Counsel asserts that she has conducted a conscientious review of the record and the relevant law and has determined that Mother's appeal is wholly without merit. Counsel informed Mother of the provisions of Rule 26.1(c), provided her with a copy of counsel's motion to withdraw and the accompanying brief, and advised her that she could submit in writing any additional points that she wished the Court to consider. Mother has submitted a narrative for the Court's consideration. The Delaware Department of Services for Children, Youth and Their Families ("DSCYF") as the appellee and the Children's attorney from the Office of the Child Advocate have responded to counsel's Rule 26.1(c) brief and argue that the Family Court's judgment should be affirmed.

(3) On February 22, 2024, DSCYF—which had opened a treatment case for Mother four years earlier just before Jason was born substance-exposed—petitioned for emergency custody of the Children after a social worker observed a severe burn on Alexander's chest and learned that Mother had opted to treat the burn

---

[2] The Court assigns pseudonyms to the Children under Rule 7(d). The Family Court's order also terminated the parental rights of the Children's father. We refer only to facts in the record that relate to Mother's appeal.

herself instead of taking Alexander to be seen by a medical professional. The Family Court granted DSCYF's petition that evening.

(4) With the filing of DSCYF's dependency-and-neglect petition, the mandated hearings ensued.[3] At the preliminary protective hearing, the Family Court found probable cause that the Children were neglected in Mother's care because of her failure to: (i) seek medical treatment for Alexander's burn injury, (ii) address the Children's routine medical and dental needs, and (iii) ensure that Conner and Alexander attended school regularly.

(5) The Family Court held a contested adjudicatory hearing on April 9, 2024. The evidence presented fairly showed that Mother had not followed up on recommended medical care for Alexander, who had suffered a severe burn and had been referred to an ophthalmologist to address his "lazy" eye, or Jackson, who had been scheduled for follow-up appointments because of his failure to gain weight after birth and was behind on his vaccinations. Mother was also unable to explain why Conner, who was eight years old, was still in first grade while Alexander, who was five years old, was in kindergarten, but she admitted that Conner had missed "a few months" of school. DSCYF had 24 prior investigations and 3 prior treatment cases involving Mother, at least one of which resulted in DSCYF taking custody of

---

[3] When a child is removed from his home by DSCYF and placed in foster care, the Family Court is required to hold hearings at regular intervals under procedures and criteria detailed by statute and the court's rules. 13 *Del. C.* § 2514; Del. Fam. Ct. Civ. Proc. R. 212-219.

Mother's four older children for a period of time. Mother had been uncooperative with DSCYF's efforts to ensure that the Children received proper medical care. Similarly, Mother—who had been diagnosed with bipolar disorder, depression, and anxiety—had rebuffed DSCYF's referrals to mental health providers until after the Children came into DSCYF custody. At the conclusion of the hearing, the Family Court found by a preponderance of the evidence that the Children were dependent, neglected, or abused in Mother's care, noting that it was "highly concerned" about Mother's failure to seek medical treatment for Alexander's burn injury.

(6) At the May 7, 2024 dispositional hearing, the court reviewed with Mother the case plan that DSCYF had developed to facilitate her reunification with the Children. Mother's case plan required her to: (i) complete a parenting course, work with a family interventionist to implement the skills that she learned from the course, and visit regularly and appropriately with the Children; (ii) undergo a substance abuse evaluation, follow all treatment recommendations, sign consents for DSCYF to have access to her records, and submit to random urine screens; (iii) undergo a mental health evaluation with Dr. Rachel Brandenburg, follow all treatment recommendations, and sign consents for DSCYF to have access to her records; (iv) obtain and maintain stable employment or other significant source of income; and (v) cooperate with DSCYF to address the Children's educational and medical needs. Because the circumstances surrounding Alexander's burn injury

4

were still under investigation, Mother's case plan also required her to attend all relevant court proceedings and refrain from committing any criminal offenses.

(7) As for the Children, they had been placed in appropriate foster homes. Jackson had been diagnosed with autism, and Jason and Jackson's daycare provider had recently informed DSCYF that it could no longer accommodate their disruptive behaviors. Mother had missed two of the most recent visits with the Children. At the conclusion of the hearing, the court granted Mother's counsel's request for additional time to review the records related to Mother's prior participation in parenting courses so that counsel could lodge a formal objection if counsel thought that the records should satisfy the parenting-class component of Mother's case plan. Counsel did not file an objection to the proposed case plan, and the Family Court adopted it.

(8) As of the August 27, 2024 review hearing, Mother had not enrolled in a parenting course but had submitted to DSCYF a certificate of completion from a parenting course that she had completed ten years earlier—notably, before the Children were born. DSCYF planned to refer Mother to a new parenting course that was tailored to its individual participant's needs. DSCYF emphasized that mere completion of the program was insufficient to complete the parenting component of Mother's case plan: Mother needed to show that she could put the skills that she learned in the course to use. DSCYF, the court, and the Children's attorney all

5

explained to Mother that her completion of a parenting course ten years earlier did not relieve her of this new obligation to complete a parenting course. Mother was engaged in substance-abuse and mental-health treatment with Henrietta Johnson Medical Center ("Henrietta Johnson") and had signed consents, but DSCYF had not been able to verify Mother's participation, and her evaluation with Dr. Brandenburg had not yet been scheduled. Mother remained unemployed but had an upcoming appointment with the Department of Social Security to apply for disability benefits.

(9) The Children were doing relatively well in their respective foster homes. Conner, Alexander, and Jason were attending regular counseling sessions to address their behavioral and emotional needs. All three boys also suffered from serious tooth decay requiring various remedial measures, including tooth extractions. Jackson was not, in fact, autistic, but he suffered from developmental delays and had been referred to speech therapy. DSCYF confirmed that, to successfully complete the parenting component of her case plan, Mother needed to complete a parenting course and its respective evaluations, consistently visit with the Children, and attend the Children's academic and medical appointments. At the conclusion of the hearing, the court reminded Mother that, although reunification remained the permanency goal, time was of the essence.

(10) A second review hearing was held on November 19, 2024. Mother had completed an intake for a parenting class on November 8 and had recently expressed

6

an interest in working with a family interventionist after initially declining to do so. Mother remained engaged in mental-health and substance-abuse treatment through Henrietta Johnson and had been prescribed Suboxone, but Henrietta Johnson had not provided updates on her treatment to DSCYF. On October 30, Mother had completed an evaluation with Dr. Brandenburg. Mother had attended seven of twelve scheduled visits with the Children and was attending the Children's medical and educational appointments on a fairly consistent basis. Conner and Alexander were benefiting from counseling, and their behavior at school was improving. Jason, however, had been diagnosed with post-traumatic stress disorder as well as attention-deficit/hyperactivity disorder ("ADHD") and showed signs of food insecurity.

(11)  Before the next review hearing, DSCYF moved to terminate Mother's parental rights for her failure to plan for the Children's physical needs or mental and emotional health and development.

(12)  As of the February 11, 2025 review hearing: (i) Mother had been enrolled in a parenting course and her instructor was scheduled to evaluate Mother's implementation of the skills that she had learned the following day, and (ii) Mother usually attended the Children's medical, therapeutic, and educational appointments. But Mother had also disclosed inappropriate information to Conner and Alexander, including information about the ongoing dependency-and-neglect proceedings as well as the boys' half-sibling's untimely death. On several occasions between

August 2024 and November 19, 2024, Mother had tested positive for amphetamines, methamphetamines, and MDMA. DSCYF had just received the results of Dr. Brandenburg's mental health evaluation, and she recommended that Mother complete a detox program. Mother was in the process of appealing the denial of her Supplemental Security Income claim and had failed to show for a team meeting on January 19. The remaining barriers to Mother's reunification with the Children were her need to engage in substance-abuse and mental-health treatment, demonstrate appropriate parenting behaviors, and establish a financial plan for providing for the Children.

(13) The parties convened for a permanency hearing on April 8, 2025. Dr. Brandenburg's evaluation was discussed in greater detail. Dr. Brandenburg had diagnosed Mother with stimulant-use and opioid-use disorders, and she recommended that Mother enroll in a detox substance-abuse program with therapy components. Dr. Brandenburg was concerned that Mother's substance abuse was affecting her ability to parent. According to DSCYF, however, Mother was having appropriate visits with the Children and was compliant with her parenting course. And the criminal investigation into Mother's role in Alexander's burn had been closed. But Mother had: (i) not meaningfully engaged with the family interventionist; (ii) missed two DSCYF team meetings; (iii) not enrolled in a detox program (despite DSCYF referrals); (iv) not created a budget; (v) missed several of

8

the Children's medical, educational, and therapeutic appointments; and (vi) refused to consent to the use of medication to treat Conner's and Alexander's ADHD diagnoses. At the conclusion of the hearing, the Family Court granted in part DSCYF's motion to change the permanency goal and changed the goal from reunification to the concurrent goals of reunification and termination of parental rights ("TPR") for the purpose of adoption. The court stressed to Mother that she needed to enroll in a detox program and ordered that visitation be increased to give Mother the opportunity to demonstrate that her parenting skills had improved.

(14) As of the July 17, 2025 post-permanency hearing, Mother had been enrolled in an outpatient substance-abuse treatment program at Essentials Recovery ("Essentials") since April. However, she had missed four meetings and tested positive for alcohol. Mother was also receiving her mental health treatment through Essentials, although she could not recall what medications she had been prescribed. Mother had missed several visits with the Children because, she claimed, the visits conflicted with her obligations under the substance-abuse treatment program. Mother remained unemployed and testified that the Children's father would be helping her meet the Children's financial needs until she found employment. DSCYF asked the court to schedule the next review hearing as a TPR hearing. Mother objected, asking for more time to work on her case plan. At the conclusion of the hearing, the court scheduled a TPR hearing for October 21, 2025. The court

noted that it was "particularly concerned" about Mother's failure to comply with the substance-abuse and income components of her case plan. The court directed Mother to ensure that the Essentials treatment program complied with Dr. Brandenburg's recommendations and noted that Mother had not yet completed a detox program.

(15) At the October 21, 2025 TPR hearing, the Family Court heard testimony from Mother; Mother's DSCYF treatment worker; the chief advancement officer for the Limen intensive outpatient substance abuse treatment program ("IOP"); Mother's therapist with Essentials; the Children's DSCYF permanency worker; Conner, Alexander, and Jason's foster mother; and the Children's Presley Ridge social worker/treatment coordinator. The evidence fairly established that although Mother had not successfully completed the Essentials program, Mother had successfully completed the Limen eight-week IOP. But DSCYF wanted to see six months of sobriety, and Mother had only been sober for two months. Mother remained unemployed and without a source of stable income. Although Mother had successfully completed a parenting course, DSCYF had been unable to assess whether she was able to utilize the skills that she had learned because Mother had failed to engage with a family interventionist. Critically, Mother had not visited with the Children since July 11, 2025, although a referral had been made to a program located in Kent County near the Children's foster homes that would have allowed her to visit with the Children for four consecutive hours in a home-like setting.

Indeed, phone communication had been suspended after Mother informed the Children that she would not be visiting with them because traveling to Kent County for visitation would have a negative impact on her mental health. Conner, in particular, faulted himself for being placed in a foster home "too far" away from Mother. Also of consequence, Mother had not attended any of the Children's medical, educational, or therapeutic meetings since the post-permanency hearing. Following the hearing, the Family Court issued a 70-page decision granting DSCYF's TPR petition. This appeal followed.

(16) On appeal, this Court is required to consider the facts and the law as well as the inferences and deductions made by the Family Court.[4] We review legal rulings *de novo*.[5] We conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly erroneous.[6] If the trial judge has correctly applied the law, then our standard of review is abuse of discretion.[7] On issues of witness credibility, we will not substitute our judgment for that of the trier of fact.[8]

---

[4] *Wilson v. Div. of Family Servs.*, 988 A.2d 435, 439-40 (Del. 2010).
[5] *Id.* at 440.
[6] *Id.*
[7] *Id.*
[8] *Wife (J.F.V.) v. Husband (O.W.V., Jr.)*, 402 A.2d 1202, 1204 (Del. 1979).

(17) The statutory framework under which the Family Court may terminate parental rights requires two separate inquiries.[9] First, the court must determine whether the evidence presented meets one of the statutory grounds for termination.[10] When the statutory basis for termination is failure to plan, the Family Court must also find proof of at least one additional statutory condition.[11] If the Family Court finds a statutory basis for termination of parental rights, the court must then determine whether, under 13 *Del. C.* § 722, severing parental rights is in the child's best interests.[12] Both of these requirements must be established by clear and convincing evidence.[13]

(18) Here, the Family Court found that DSCYF had proved, by clear and convincing evidence, that the termination of Mother's parental rights was appropriate because of her failure to plan,[14] that the Children had been in DSCYF custody for more than six months,[15] that DSCYF previously had custody of another child of Mother's,[16] and that Mother had a history of dependency, neglect, abuse, or

---

[9] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).

[10] *Id*. at 537.

[11] 13 *Del. C.* § 1103(a)(5)(a)-(e) (listing additional conditions).

[12] *Shepherd*, 752 A.2d at 536-37.

[13] *Powell v. Dep't of Servs. for Children, Youth and Their Families*, 963 A.2d 724, 731 (Del. 2008).

[14] 13 *Del. C.* § 1103(a)(5).

[15] *Id*. § 1103(a)(5)(b).

[16] *Id*. § 1103(a)(5)(c).

lack of care of the Children or another child.[17] The Family Court also found, by clear and convincing evidence, that termination of Mother's parental rights was in the Children's best interests.

(19)   In the narrative that Mother has submitted for the Court's consideration, Mother claims that she completed "everything" on her case plan and that it is in the Children's best interests that they live with her. But we find that the Family Court's factual finding that Mother did not, in fact, complete the elements of her case plan is amply supported by the record. Likewise, the Family Court's finding that it is in the Children's best interests that Mother's parental rights be terminated is more than adequately supported by the record. And we can discern no error in the court's application of the law to the facts. We therefore conclude that Mother's appeal is wholly without merit and devoid of any arguably appealable issues. We are satisfied that Mother's counsel made a conscientious effort to examine the record and the law and properly determined that Mother could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court be AFFIRMED.  Counsel's motion to withdraw is moot.

BY THE COURT:

/s/ Gary F. Traynor
Justice

---

[17] *Id.* § 1103(a)(5)(d).